**In re DENNIS GREENMAN SECURITIES LITIGATION.**

**This Document Relates To Leon NAMOFF, et al.**

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH, et al.,**

Master File No. 81–708–A1–Civ.
No. 82–0665–Civ.–WMH.

United States District Court,
S.D. Florida,
Miami Division.

Nov. 26, 1985.

## MEMORANDUM OPINION IN SUPPORT OF FINAL JUDGMENT

HOEVELER, District Judge.

This cause came before the Court on the Joint Motion for Entry of Final Judgment made by the Plaintiffs' Committee [1], A.G. Becker, Inc. and Paine, Webber, Jackson and Curtis, Inc. on August 2, 1985. On that date, the Court entered Final Judgment certifying a class for purposes of settlement pursuant to Federal Rule of Civil Procedure 23(b)(1) and approving a settlement in this case.

The Final Judgment is the culmination of several years of painstaking efforts on the part of most parties involved, first to develop, then to settle, the many issues presented. The nefarious activities of Dennis Greenman, together with the length of time over which he perpetrated his scheme, produced a complex of problems and left a trail of damaged persons seldom seen in an action of this type. These complexities and the frightful portent they present, all of which will be discussed hereafter, have combined to require a result which in my humble opinion is fully justified under Federal Rule 23(b)(1). Any suggestion that the "rights" of the relatively small number of objecting investors have been infringed by the procedure involved must spring from a myopic view, not only from the relationship of the parties but of the consequences of other courses of action. This case has presented a clear opportunity to consider the rights and welfare of many and the importance of those rights, indeed the financial future of many older persons in relation to a relative few who contend that Rule 23(b)(1) does not permit the result achieved. Indeed, it is time that this rule be given the vitality which, in a setting of this type, seems not only proper but compelling. I will discuss this aspect of the case in more detail hereafter.

Prior to entry of the Final Judgment, each member of the Class and other inter-

1. The terms used in this Memorandum Opinion have the same definitions as contained in the Revised Settlement Agreement which is contained in the Record of this cause.

ested persons received notice of the terms of the proposed settlement and of a Fairness Hearing to be held on May 24, 1985. At the Fairness Hearing, all persons who wished to do so were given an opportunity to appear, make presentations, cross-examine witnesses and make arguments in the support of or opposition to (a) the certification of the Class for settlement pursuant to the provisions of Fed.R.Civ.P. 23(b)(1); (b) the fairness, reasonableness and adequacy of the settlement; (c) the dismissal on the merits and without costs of the various actions consolidated in this litigation; and (d) the barring of further claims arising out of the securities fraud which generated this litigation. After the Fairness Hearing, the Court entered a Non-Final Approval Order on May 24, 1985 approving the settlement. The Court entered final judgment on August 2, 1985. The Court has reviewed the record in this cause, the memoranda submitted by the objectors to the settlement— the *Baer* Plaintiffs, the Block objectors, and the Schillinger objectors—and the memorandum submitted by Paine Webber in response to the objections to the settlement. The Court having reviewed the record and the various memoranda submitted by the parties and having had the benefit of proposed findings of fact and conclusions of law submitted by the Plaintiffs' Committee in support of the settlement enters the following memorandum opinion.

## FACTUAL BACKGROUND OF THE GREENMAN FRAUD

In 1981, the Federal Bureau of Investigation uncovered a massive securities fraud perpetrated by Dennis Greenman, a securities salesman.

This litigation began in April, 1981 when the Securities and Exchange Commission (the "SEC") sought to protect the interests of certain investors who had been defrauded by Mr. Greenman by filing a complaint. The SEC sought a temporary restraining order, preliminary and permanent injunctions and the appointment of a receiver.

After hearing testimony and argument of counsel, the Court entered a Temporary Restraining Order and Order Appointing Receiver on April 2, 1981 [2].

The testimony and evidence presented in various proceedings subsequent to the initial hearing showed, and the Court so found, that from mid-1977 through March 1981, Greenman was a broker with several different brokerage firms. He was initially employed by Merrill Lynch in Jacksonville, Florida. He moved to Paine Webber in Miami, Florida in September, 1978 and in May, 1980, he was employed as vice president by Barclay Financial Corporation, to be in charge of Barclay's Dadeland office.

Barclay was a small discount brokerage firm in South Florida which lacked securities transaction clearing capability. Therefore, Barclay contracted with A.G. Becker, Inc. to serve as Barclay's fully disclosed clearing agent on various national securities exchanges. At the time the actions of the FBI and SEC terminated the fraud in April, 1981, all of the Greenman customer accounts were located at Becker through Barclay.

During Greenman's association with the brokerage houses—a period slightly less than four years—Greenman solicited investments of $86,000,000 from a total of over 600 investors who directly or indirectly opened investment accounts through Greenman. Greenman told the investors that the funds in their accounts would be invested in an arbitrage program he had devised which would return substantial profits for the investors. The actual trading records produced in this litigation showed that in fact Greenman was investing the investors' funds in options and sustaining heavy losses.

Greenman was able to convince his investors that their accounts were profitable by diverting the genuine account statements to false post office box addresses and by forwarding falsified account statements to the investors. Greenman was able to sus-

2. See also Order Clarifying the Appointment of Hugo L. Black, Jr. As Receiver, entered February 22, 1984.

tain the illusion of profitability by using funds deposited by new investors to make distributions, upon request, to earlier investors. He was also diverting funds from the investors' accounts to his own use.

At the time the fraud was discovered and halted in April of 1981, the Greenman investors were out-of-pocket over $50,000,000 in principal investment. Attempts by the Receiver and his accountants to account for and trace the investors funds further revealed that Greenman had commingled the funds and securities in the investors' accounts. As a result, it was impossible accurately to trace the funds deposited by the investors.

Based upon the presentations to the Court by the Receiver and his accountants, the SEC and others, and the entire record, the Court found on a number of occasions, and so finds again that the Greenman investor accounts comprise a commingled fund in which the investors have no separable legal interests, but instead have proportionate equitable interests determined on the basis of the net of amounts deposited and withdrawn prior to April 1, 1981.

After the appointment of Hugo L. Black, Jr. as Receiver on April 2, 1981, the Greenman accounts at Becker through Barclay were liquidated and the proceeds placed in government insured, interest-bearing accounts at a Court-approved brokerage firm. The Receiver and his counsel filed and prosecuted numerous lawsuits for the recovery of assets belonging to the investors. One such suit was against the Metropolitan Bank and Trust Company of Tampa, Florida, which resulted in a speedy settlement producing $2,000,000 for the receivership estate shortly before the Federal Deposit Insurance Corporation took control of that institution.

By order dated June 2, 1981, the Court authorized the Receiver to file an additional ancillary complaint against Greenman, Becker, Becker's insurer, and Paine Webber for the recovery of the investors' monies. The Receiver did so on June 2, 1981. Certain investors objected to the Receiver maintaining that action and filed separate actions. After extended briefing, argu-

ment of counsel and consideration by the Court, the Court determined that the better course was to certify this case under Rule 23(b)(1). *See In Re Greenman Securities Litigation,* 94 F.R.D. 273 (S.D.Fla.1982), hereinafter "Pre-Trial Order I".

Pursuant to Pre-Trial Order I, this action was commenced against Paine Webber, Becker, Barclay, Robert L. Ferman and Richard H. Sacks (the principals of Barclay) and Greenman on or about April 1, 1982. An Amended Complaint was filed on April 2, 1982. In addition, certain actions were stayed and consolidated pursuant to Fed.R.Civ.P. 42(a) and are now collectively referred to as the "Dennis Greenman Securities Litigation". All investors who sustained losses as a result of Greenman's fraud became members of the class as defined in Pre-Trial Order I.

In responsive pleadings to the Amended Complaint, Paine Webber and Becker each asserted various cross-claims against other defendants as well as counterclaims against members of the plaintiff class alleged in the Amended Complaint. Paine Webber additionally filed a Third Party Complaint against 104 third party defendants. Becker also filed a Third Party Complaint against various third party defendants.

In July of 1983, a Second Amended Class Action Complaint was filed adding Merrill Lynch and certain officers of Paine Webber as defendants.

In the spring of 1983, the Plaintiffs' Committee and certain representatives of the defendants notified the Court that preliminary settlement discussions had commenced. These discussions continued through the summer while pleading practice and discovery proceeded among the parties, who numbered in excess of 120 by that time. In August, 1983, the Court was again informed that settlement discussions were ongoing but that no concrete agreement had materialized. At the suggestion of counsel for both the plaintiffs and certain of the defendants, and pursuant to Fed.R.Civ.P. 16, the Court agreed to partic-

ipate for purposes of facilitating settlement negotiations.

Because of the complexity of this case, the settlement process took a considerable amount of time. However, the parties finally reached an agreement which was presented to this Court for approval. For the reasons which follow, the agreement was approved and this case was certified for settlement purposes as a class action pursuant to Rule 23(b)(1).

## STANDARDS FOR APPROVAL OF A CLASS ACTION SETTLEMENT

█ This Court's decision on approval of the settlement of this class action is guided by established standards set by the Fifth Circuit Court of Appeals [3]. *See In re Corrugated Container Antitrust Litigation,* 643 F.2d 195 (5th Cir.1981); *Miller v. Republic National Life Insurance Co.,* 559 F.2d 426 (5th Cir.1977); *Cotton v. Hinton,* 559 F.2d 1326 (5th Cir.1977). As background to its considerations, this Court initially recognizes the universal principle that settlements are highly favored in the law. *Miller v. Republic National Life Ins. Co., supra.* "Particularly in class action suits, there is an overriding public interest in favor of settlement." *Cotton v. Hinton, supra,* 559 F.2d at 1331. In conjunction with acknowledging the policy favoring settlements, the Court must make a two part determination that: (1) there is no fraud or collusion in reaching the settlement, and (2) the settlement is fair, adequate, and reasonable. *Bennett v. Behring Corp.,* 737 F.2d 982 (11th Cir.1984); *Ruiz v. McKaskle,* 724 F.2d 1149 (5th Cir.1984); *Cotton v. Hinton,* 559 F.2d 1326 (5th Cir.1977).

Factors to be considered in assessing whether a proposed settlement is fair, adequate and reasonable include the following which the Court has found relevant in this case: (1) the likelihood of success at trial and range of potential recovery, *In re Corrugated Container Antitrust Litigation, supra;* (2) the complexity, expense, and duration of litigation, *Bennett v. Behring*

Corp., supra; (3) the terms of the settlement, *Ruiz v. McKaskle, supra, In re Corrugated Container Antitrust Litigation, supra;* (4) the procedures afforded to notify the class members of the proposed settlement, and to allow them to present their views, *Miller v. Republic National Life, supra;* (5) the judgment of experienced counsel for the Plaintiff class, *Pettway v. American Cost Iron Pipe Co.,* 576 F.2d 1157 (5th Cir.1978); *Cotton v. Hinton, supra; Holmes v. Continental Can Co.,* 706 F.2d 1144 (11th Cir.1983); (6) the substance and the amount of opposition to the settlement, *In re Corrugated Container Antitrust Litigation, supra; Cotton v. Hinton, supra;* and (7) the stage of proceedings at which the settlement was achieved. *Bennett v. Behring Corp., supra.*

After considering the above principles and factors the Court concludes that the settlement was reached without collusion, is fair, adequate and reasonable, and should be approved.

### A. *Absence of Collusion*

There is no evidence in the record which would even remotely indicate that there was any collusion among the parties or their attorneys in arriving at the terms of the settlement. On the contrary, the record demonstrates that the parties conducted extended and often heated arm's length negotiations for a period of over eighteen months, beginning in March of 1983 and continuing through January of 1985 as the major parties wrestled with drafting the complex settlement agreement. The Court actively participated in numerous conferences scheduled pursuant to Fed.R.Civ.P. 16 (a)(5) to assist in facilitating the settlement. These conferences often resolved temporary deadlocks. The Court often observed the vigor with which the attorneys' advanced their respective parties' interests.

The settlement ultimately exacted for the plaintiffs' class was more favorable than that which the principal defendants were

---

**3.** These Fifth Circuit decisions are binding precedent on this Court. *Bonner v. City of*    *Pritchard,* 661 F.2d 1206 (11th Cir.1981).

originally willing to make. Furthermore, despite lengthy negotiations, some of the parties ultimately refused to participate in the settlement.

The Court finds that the settlement was negotiated at arm's length and without collusion.

### B. Fairness, Adequacy, and Reasonableness

Several factors bear upon this Court's consideration of the fairness, adequacy and reasonableness of the settlement:

1. likelihood of success at trial and range of possible recovery, See Corrugated Cases, 643 F.2d at 212;

2. the complexity, expense and duration of litigation. Id. at 217 (citation omitted);

3. the terms of the settlement;

4. the procedures afforded to notify the class members of the proposed settlement;

5. the judgment of counsel;

6. the substance and amount of opposition, Cotton v. Hinton, 599 F.2d at 1331; and finally,

7. the stage of the proceedings at which the settlement was achieved, Corrugated Cases, 643 F.2d at 217.

### 1. Likelihood of success at trial and range of potential recovery

This case began in April of 1981 when the FBI and SEC uncovered Dennis Greenman's fraud. The SEC commenced suit and obtained appointment of Receiver Hugo L. Black, Jr. Thereafter, numerous suits were commenced on behalf of defrauded investors in varying forms—separate actions, a class action, consolidated actions, and a Receiver's suit. In its Pre-Trial Order I of April, 1982, this Court determined that all actions related to Greenman's fraud should proceed under the master style "In Re Greenman Securities Litigation", and that the suits on behalf of the defrauded investors should proceed as a class action under Fed.R.Civ.P. 23(b)(1) (discussed elsewhere in this opinion).

The parties entered into extensive discovery which included exchange of hundreds of thousands of pages of documents and months of depositions. In addition, numerous pleadings were exchanged with extensive briefing of the legal issues involved in the case.

Attorneys for the parties worked thus for over a year after the Court's issuance of Pre-Trial Order I diligently preparing the parties' cases. However, it became apparent to all actively involved in the litigation that the policy in the law favoring settlements would find happy application in this case. Discovery was not complete despite continuing and exhaustive efforts of the parties' attorneys. A major dispute had arisen as to the Defendants' entitlement to take depositions of the over 600 absent class members.

Certain of the main parties therefore desired to direct their attention towards the possibility of settlement and requested this Court's assistance in that regard. Aaron Podhurst, Esq., counsel for Defendant A.G. Becker, suggested a procedure by which this Court might help the parties' settlement efforts. Specifically, it was suggested that this Court set aside time for an extended hearing at which parties desiring to do so would present the equivalent of an opening statement outlining what the evidence in support of their respective positions would show. Based upon the presentations, the Court would give general advices to the parties as to forms or amounts their settlement contributions could take based upon the apparent strengths or weaknesses of their positions. The participating parties—while not bound by the Court's advices—committed in good faith to have their settlement deliberations be guided thereby.

The "major" parties—including the Plaintiffs' Committee, Defendants Paine Webber, Merrill Lynch, A.G. Becker, Royal Trust, the individual Paine Webber officer defendants, and certain of the brokerages houses' underwriters—agreed to this procedure. A hearing was scheduled and notice was sent to all attorneys of record. A two day hearing was held on September 12–13, 1983 and all parties who wished to make presentations were permitted to do so.

The Court gave careful attention and consideration to all parties' presentations. While the Court was in no way pre-trying or pre-judging the ultimate case on the merits, the procedure did provide the Court with a good overview of the potential strengths and weaknesses of the parties' positions. The information presented during the procedure, as well as the Court's familiarity with the discovery results and the parties' briefs on the legal issues, enabled the Court to make an informed appraisal of the likelihood of success of the plaintiff class.[4]

The plaintiff class presented important claims against Merrill Lynch and Paine Webber, the two brokerage houses who actually employed Dennis Greenman, and which, it was vigorously asserted, may be responsible under respondeat superior theory for his fraud. However, a substantial portion of the damages was sustained when Greenman was working for Barclay Financial Corporation—a small brokerage firm with, almost literally, no assets. Barclay had a clearing broker arrangement with A.G. Becker. The law appears unsettled as to the responsibility of a clearing broker for the acts of an introducing broker's employees. Due to the unsettled status of the law on this point, it appeared that there was a significant risk that the losses sustained by the class members while Greenman was at Barclay clearing through Becker could go uncompensated altogether should there be an adverse ruling on the legal issues at some stage in trial or appellate proceedings. While claims for punitive and treble damages had also been made, consideration was given to the risk that a substantial portion of the compensatory damages might be unrecoverable.

The Receiver had also instituted constructive trust actions against investors whose withdrawals exceeded their investments in Greenman's investment program.

The legal basis for these actions appeared meritorious, but it also appeared that there were potential problems with tracing funds and with collectability.

In sum, it appeared that the plaintiff class' likelihood of success was substantial but that favorable adjudication and recovery were by no means certain. The range of recovery covered a spectrum from full recovery of all out-of-pocket losses plus punitive and treble damages to recovery of only a portion of the out-of-pocket losses. In September of 1983, at the conclusion of the procedure described above, the Court indicated that a recovery in the neighborhood of 85% of the out-of-pocket losses of the class members would represent a good settlement result, and the Court made recommendations for contributions from the various defendants and third party defendants toward achieving the approximate 85% recovery.

In assessing fairness, reasonableness, and adequacy of the ultimate settlement herein, the Court was able to use the information gained and assessments made during the September 1983 procedure in giving the requisite consideration to the plaintiff class' likelihood of success and range of potential recovery. Certain objectors have protested that the settlement amount is inadequate because they optimistically opined that all damages, including punitive and treble damages, are absolutely and certainly recoverable. However, the settlement ultimately achieved for the plaintiff class represents a near 90% recovery of their losses. In assessing the success factor and approving the settlement, this Court was mindful of the Fifth Circuit's words: "Neither should it be forgotten that compromise is the essence of a settlement ... inherent in compromise is a yielding of absolutes and an abandoning of highest hopes." *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977).

**4.** The Court is—and has been throughout these proceedings—mindful that the case is not to be tried in settlement hearings. *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1972). All conclusions reached herein and during the lengthy settlement process in which the Court participated were and are in the context of the fairness, reasonableness, and adequacy of the settlement and do not constitute findings of fact or conclusions of law on the substantive issues presented in this litigation.

### 2. *The complexity, expense, and duration of litigation*

The Court has given some indication in the previous section of the potential of this case for complexity, expense, and duration of litigation. Reference is also made to Pre-Trial Order I, published as *In re Greenman Securities Litigation*, 94 F.R.D. 273 (S.D.Fla.1982) wherein the Court reviewed these factors at length.

At the time the settlement came before the Court, this case involved a main action with twelve defendants, in excess of one hundred third-party defendants, and five fourth-party defendants. In addition to the multiple securities law, RICO and common law claims of the plaintiff class members against the defendants and the affirmative defenses thereto, the third and fourth party claims involve complex contribution and indemnity issues and insurance coverage disputes. Furthermore, there are Receiver's constructive trust actions brought against investors who made 'profits' from Greenman's fraudulent scheme, as well as approximately thirty related actions brought by various investors, financial institutions who loaned funds invested in Greenman's program, among others.

The Court had stayed all proceedings in the above actions pending outcome of the settlement efforts. The present settlement contemplates resolution of all of the actions and dismissal of same. Should the actions have proceeded, the portents for complexity, expense and duration were staggering. The number of parties involved and the issues raised in the roomful of pleadings already filed on their behalf are eloquent testimony to the complexity of the task of sorting out and adjudicating their rights and liabilities inter se, both in jury and non-jury proceedings. Some indication of the potential expense may be found by noting that costs expended on behalf of the Plaintiffs alone to date exceeds $2 million [5]. The major Defendants have reported to the Court expenditures far in excess of that sum. Costs and attorney hours have also been expended on behalf of the over 120 defendants and third and fourth party defendants, which points to staggering totals.

Discovery is not yet complete and no trials have occurred let alone such appeals and retrials as might follow therefrom. Only settlement can shut the floodgates on this tidal wave of legal expenditures.

The projected duration of the litigation process absent settlement is equally nightmarish in prospect. In the main case alone, defendants seek to depose all of the over 600 absent class members. Without passing on the merits of Defendants' contention that they are entitled to such depositions, the Court notes that such a process would require over two years of taking depositions every day. Even without such depositions, the parties to the main action would probably need at least six months to complete discovery, and possibly two months to try the first of possibly several cases. Certain parties have indicated their belief that discovery and trial would each be of substantially longer duration. The crowded criminal docket of this Court subject to the demands of the speedy-trial statute is well recognized. It is thus difficult to project when a two month civil trial could be scheduled, but it is safe to say it could not be immediately upon request. Based on this Court's observation of the diligence and tenacity of counsel for the parties while in the litigation posture and the complexity and unsettled nature of certain of the legal issues, it may reasonably be projected that the appellate process would be invoked after trial proceedings were completed. In short, the duration of the main case alone will be a matter of years, leaving aside the further time which will be required for the related actions. The Court notes that Vernon Patrick, Esquire, who presented expert testimony at the Fairness Hearing on behalf of the Plaintiffs' Committee in favor of the settlement, testified that he was involved in a similarly complex class action which took fourteen years to reach completion.

---

**5.** The Court is aware of the amounts of the plaintiffs' costs and attorneys' fees as it was decreed in Pre-Trial Order I that same should be paid from the fund retrieved by the Receiver. The attorneys were directed to work at reduced hourly rates pending outcome of the cause.

Prior to settlement and when it appeared that the first of the anticipated trials would be imminent, the parties, in an abundance of caution and in a serious effort to prepare for trial were discussing the prospect of double and triple track discovery. As has been suggested previously, certain of the defendants insisted that they could not be fully protected unless most or all of the 600 plus investors were deposed. Even a cursory review of the pleadings in this case demonstrates the multitude of issues growing out of the complaint, the responses, the third and fourth party complaints and the responses thereto. The spectre of continued litigation on a case by case basis, as well as on a different state and district basis is financially frightening. Indeed, at some point, the war may be won by the class, but the price paid for such victory may be so costly in time and actual expense that the principal beneficiaries would be the lawyers, who had participated in the endless procedures. This is not by way of criticism, but in recognition of the unfortunate consequences of a case not managed under one roof (if such is required by the ultimate decision in this case). I find it difficult to understand why the dissident few should be permitted to "wag the dog" in an effort to realize ambitions which obviously go well beyond actual recompense. If Rule 23(b)(1) has a legitimate place in the Rules of Procedure, I can envision no more appropriate application than in this case.

The complexity, expense, and duration of litigating this case and all the actions and claims contained within it mitigated heavily in favor of settlement and were given due weight accordingly.

### 3. *The terms of the settlement*

The terms of the settlement provide for contributions from the various defendants and third and fourth party defendants to the action which, in combination with amounts previously recovered and distributed by the Receiver, will comprise a total recovery of near 90% of the losses.[6] The Court finds that such a substantial recovery factor alone mitigated highly in favor of approving the settlement. *Compare In re Art Materials Antitrust Litigation,* 100 F.R.D. 367 (N.D.Ohio 1983).

The Plaintiffs' Committee additionally negotiated a particularly favorable term for the class members which required participating contributors to the settlement to deposit their settlement contributions into interest-bearing escrow accounts pending actual payment of the settlement funds per the terms of the settlement agreement. This term provided protection to the class members from (1) any inclination the Defendants may have had to prolong or delay the settlement procedure, and (2) the passage of time before distribution which would inevitably be occasioned by the notification and approval process at the trial level, and possibly also by the appellate process should it be invoked. By the time of the Fairness Hearing on May 24, 1985, the interest earned from the escrow accounts was approximately $330,500.00, and by the time the Final Judgment approving the settlement was entered on August 2, 1985, the interest was approximately $651,-000.00 [7].

6. Certain amounts from the total have been expanded on costs and attorneys' fees (at reduced hourly rates), with this Court's approval, for the prosecution of the class action and the Receiver's actions for the benefit of the class members. The Plaintiffs' Committee, Receiver and his attorneys have notified the Court, parties, and class members of their intention to seek additional attorneys' fees as they have been working on behalf of the class members for over four years at reduced rates.

Depending on this Court's disposition of the attorneys' fees application and certain other variables of which Plaintiffs' Committee notified the class members, the Plaintiffs' Committee estimates that the lowest net recovery to the respective class members would be approximately 77% of their net losses. For example, the variables include the fact that certain contributions to the settlement are in the form of real estate. The time and cost of liquidation could not be predicted with exactitude at the time of settlement. This variable and others were explained to the class members in a letter provided by the Plaintiffs' Committee in addition to the Revised Settlement Agreement described in Section 4, infra.

7. The figures were provided by the Receiver's accountants in a report filed in the case on September 7, 1985.

Another term of the settlement which the Court finds favorable to the class members is that which permits individual settlement with such class members as have submitted their releases even if other class members appeal the Final Judgment and/or refuse to submit their releases. While the term providing for settlement on this individual basis is at the option of certain of the principal Defendants, it injects a rational flexibility into what could have been a rigid settlement agreement given the Defendants often expressed and natural desire to effect a 'global' resolution of this case.

The Court finds that the terms of the settlement produced a compromise favorable to the class members' interests, with a fair and adequate recovery safeguarded and enhanced by the accrual of interest.

4. *The procedures afforded to notify the class members of the proposed settlement, and to allow them to present their views*

The settlement agreement among the parties provided numerous procedural safeguards for notifying the class members and all potentially interested persons of the proposed settlement terms and for allowing them to express their views in writing or in person. At the Fairness Hearing before this Court, the Plaintiffs' Committee presented evidence that all prescribed notification procedures had been effected. The procedures included the following.

The settlement agreement itself was presented to the Court with a request for a preliminary order scheduling a Fairness Hearing. The Preliminary Order was entered on April 23, 1985. Copies of the Preliminary Order, the settlement agreement, and a release form were mailed to all known class members on April 23, 1985. The class members were notified in these materials of the Fairness Hearing scheduled for May 24, 1985. Accompanying these materials was a letter from the Plaintiffs' Committee notifying the class members of such variables as might affect the amount of their recovery under the settlement including those discussed in footnote 4, *supra,* and such additional attorneys'

fees as might be awarded by this Court. The letter notified the class members of the potential range of their recovery on their net losses.

Additionally, notice of the proposed settlement and the Fairness Hearing date was published on May 3, 1985 in the Miami Herald, the Jacksonville Times-Union, the Tampa Tribune, the Atlanta Constitution, the Bergen County Record, the New York Times, and the Wall Street Journal. Said notice was again published in the New York Times on May 10 and 17, 1985, and in the Wall Street Journal on May 8 and 14, 1985.

Provision was made in the mailed and published notices for comment by all interested persons in writing and in person. The Fairness Hearing was held as scheduled on May 24, 1985. All persons who wished to speak at the Fairness Hearing were invited and permitted to do so.

The Court finds that every practicable effort was made to notify class members and interested persons of the proposed settlement terms and the Fairness Hearing to be held thereon, and to provide opportunity for all to express objection, approval, or any other views they wished to present. The Court was thus in a position to assess the settlement with knowledge that due notice had been provided, and with the benefit of commentary from all who wished to be heard.

5. *The judgment of counsel for the parties*

As frequently noted in appellate review of orders approving settlements, the trial court may take into account the judgment of counsel.

Courts often accord great weight to the opinions of counsel for the class in approving class action settlements. *See Pettway IV,* 576 F.2d at 1215 ("trial court is entitled to take account of the judgment of experienced counsel for the parties"); *Cotton v. Hinton,* 559 F.2d at 1330 ("the trial court is entitled to rely upon the judgment of experienced counsel for the parties").

*Holmes v. Continental Can Co.*, 706 F.2d 1144, 1149 (11th Cir.1983)

We recognize the discretion on the part of the class attorney often is an unavoidable fact of class action life ... [T]he traditional notion of the "client" deciding important litigation questions is often problematic in the class action context because of the difficulty in identifying the client. The class itself often speaks in several voices. Where there is disagreement among the class members concerning an appropriate course of action, it may be impossible for the class attorney to do more than act in what he believes to be the best interests of the class as a whole. *If the attorney's decision in the face of such disagreement affects each class member more or less equally,* and no allegation is made that the rights of a definable minority group within the class were sacrificed for the benefit of the majority, *the attorney's views must be accorded great weight,* and the trial judge's decision to ratify the attorney's action will seldom be overturned.

*Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1216 (5th Cir.1978) (emphasis added).

The members of the Plaintiffs' Committee in this case are competent and able counsel, experienced in class action litigation. Said counsel unanimously recommended to the class members that they indicate their acceptance of the settlement by submitting their releases, and unanimously sought this Court's approval of the settlement. The settlement terms affect all class members equally, providing that each will receive an identical percentage return on their net losses.

At the Fairness Hearing the Plaintiffs' Committee also presented the testimony of Vernon Patrick, Esquire. Mr. Patrick was presented as an expert in class action suits with extensive nationwide experience both in litigating and in negotiating settlements in such actions. Although objectors were present at the Fairness Hearing, none questioned the validity of Mr. Patrick's credentials or objected to his qualification as an expert. Counsel for certain of the ob-

jectors, in fact, specifically noted his high regard for Mr. Patrick's opinions. Mr. Patrick testified that in his opinion the settlement represented a "magnificent result" on behalf of the plaintiff class. The objectors to the settlement presented no contrary expert testimony.

The Court notes that counsel for A.G. Becker and Paine Webber are also experienced and able attorneys. These counsel—while believing the plaintiffs were receiving far more than adequate compensation—also were of the opinion that the settlement structure was fair, and that settlement was of benefit to all parties to the litigation.

In addition to the other factors considered and discussed herein, this Court gave due consideration to the judgment of experienced counsel for the parties. The Court included in this consideration a recognition that said counsel were aware that the settlement might not be approved or might be overturned on appeal, so that it would not behoove them to parade any possible weaknesses in their case.

In reviewing proposed class settlements, a trial judge is dependent upon a match of adversary talent because he cannot obtain the ultimate answers without trying the case. Indeed, that uncertainty is a catalyst of settlement. Because the trial judge must predict, the value of the assessment of able counsel negotiating at arm's length cannot be gainsaid. Lawyers know their strengths and they know where the bones are buried.

*Reed v. General Motors Corp.*, 703 F.2d 170, 175 (5th Cir.1983) Although the Court made an independent determination that the settlement should be approved, that determination was assisted by the judgment of counsel for the parties and the expert testimony of Mr. Patrick.

### 6. *Substance and amount of opposition*

The Court has also considered the substance and amount of opposition to the settlement.

At the time of the Fairness Hearing, three attorneys appeared on behalf of cer-

tain class members to present objections to the settlement.[8]

### a. *The Schillinger Objectors*

Attorney Lee Schillinger appeared on behalf of five class members—Jack Schillinger, Majorie Schillinger, Robin Schillinger, Bernard Schillinger and himself. Mr. Schillinger stated that he did not believe the settlement was fair, reasonable and adequate, and did not believe that this action was appropriately a 23(b)(1) class action. Mr. Schillinger then stated that he and his clients would nonetheless accept the settlement as they were desirous of a speedy end to the case.

### b. *The Baer Plaintiff Objectors*

Attorney Michael Klein appeared on behalf of certain class members. Counsel was not able to identify with specificity all of the class members he represented[9], but from the names he recited it appeared that he was fairly certain of his representation of approximately twenty-five class members. Mr. Klein's objection to the settlement on behalf of his clients was two fold and was presented both orally at the Fairness Hearing and in written memoranda filed with the Court. Mr. Klein first objected to certification of the class for settlement purposes under Fed.R.Civ.P. 23(b)(1), which objection is discussed in a subsequent section of this opinion. Mr. Klein's second objection to the settlement was that the settlement for near 90% recovery of net losses was not fair, reasonable, and adequate.

Mr. Klein's objection to the reasonableness and adequacy of the settlement was based on his opinion that this is a "slam dunk" case for the Plaintiff class members.

The memorandum submitted by Mr. Klein argues that the Defendants as a matter of law have absolutely no defenses to the Plaintiffs' claims. A responsive memorandum filed on behalf of Defendant Paine Webber contends that the Klein memorandum takes vastly over-simplified positions. Paine Webber cites extensive case law supporting the defenses raised by the Defendants. While recognizing the various trial burdens and legal standards applicable thereto, Paine Webber notes that Defendants are by no means precluded as a matter of law from raising and attempting to prove these defenses.

The Court has reviewed the memoranda submitted by the Klein objectors and by Paine Webber. The Court, at this juncture, is not called upon to pre-try the merits of the case nor to pre-judge the legal issues raised. For the present purpose of assessing the fairness, reasonableness, and adequacy of the settlement, it is sufficient to note that there is facial merit to some of the arguments presented by the proponents and opponents of the settlement. However, the suggestion that the case for the class can be easily won smacks more of advocacy than reality, of short term desires than a recognition of the frightful toll of long-run litigation.

The Court's review of the legal issues leads the Court to the conclusion that a showing was not made of an absolutely flawless and indefensible case for the Plaintiffs such that the recovery floor had to start at 100% in order for the settlement to be fair, reasonable, and adequate. Again, the essence of settlement is compromise, and an abandonment of highest—e.g. "slam dunk" type—hopes[10].

---

**8.** Counsel for the Federal Deposit Insurance Company appeared and raised certain procedural objections on behalf of that entity, but said objections were later withdrawn of record on July 26, 1985.

**9.** Mr. Klein's remarks indicated that he had spoken and met with a number of class members, but not all of them had made final decisions as to whether or not they wished to object to the proposed settlement.

**10.** Counsel for the *Baer* Plaintiffs stated on the record at the Fairness Hearing the following:

"This is a slam dunk case. This is the kind of case that plaintiffs' lawyers dream about."

What these dissident plaintiffs seek is more than recoupment. They suggest that the "advantage" presented by the facts gives them a right to base a demand on the possibility of recovering exemplary and/or statutory damages. Without developing the questions inherent in such a position, it is enough, at the moment, to note that, again, the small group of objecting plaintiffs seeks to "roll the dice" at the expense of all other members of the class.

The Klein memorandum did concede that recovery of treble and punitive damages might be subject to uncertainty. The memorandum thus suggested that the appropriate range for settlement was 100% to 300%. The Court notes the decision in *City of Detroit v. Grinnell Corporation,* 495 F.2d 448 (2d Cir.1974) wherein it was stated that:

> the vast majority of courts which have approved settlements in [treble damage antitrust class actions] ... have given their approval to settlements which are traditionally based on an estimate of single damages only.

495 F.2d at 458. The Second Circuit noted that "there are strong reasons why trebling is improper when computing a base recovery figure which will be used to measure the adequacy of a settlement offer." *Id.* The Court said:

> [T]o argue that treble damages ought to be considered in a calculation of a base recovery range is to distort the entire theoretical foundation which underlies the settlement process. It requires defendants to admit their guilt for the purpose of settlement negotiations. One of the underlying premises on which such negotiations are based, however, is that defendants never have to concede their guilt. They can protest their innocence of any wrongdoing and assert that they are settling for purely pragmatic business reasons. To require treble damages to be considered as part of the computation of the base liability figure would force defendants automatically to concede guilt at the outset of negotiations. Such a concession would upset the delicate settlement balance by giving too great an advantage to the claimants—an advantage that is not required by the antitrust laws and one which might well hinder the highly favored practice of settlement.

495 F.2d at 459. *See also In re Art Materials Antitrust Litigation,* 100 F.R.D. 367 (N.D.Ohio 1983).

 The Court agrees with the rationale of the *Grinnell* court that potential treble recovery (or, for the same reason, punitive recovery) should not be superimposed as a yardstick for measuring the adequacy of a settlement, lest the settlement negotiation process be derailed before leaving the station. As a practical matter, defendants are aware of their potential exposure and without doubt have governed their settlement negotiations accordingly. A process which in essence forces admissions of guilt by requiring that negotiations start downwards from a treble recovery ceiling is not a mechanism likely to encourage settlements.

### c. *The Block Objectors*

Attorney Byron Block filed a memorandum and appeared at the Fairness Hearing on behalf of three class members who objected to the settlement: (1) on grounds that the Rule 23(b)(1) certification was inappropriate—adopting the *Baer* Plaintiffs' memorandum, and (2) on grounds that the settlement is not fair, reasonable, and adequate. The Rule 23(b)(1) issue is discussed in a later section of this opinion.

The Block objectors' objection to the fairness, reasonableness, and adequacy of the settlement was based on several considerations. First, a view was expressed similar to that of the *Baer* Plaintiffs' objectors (although without elaboration or legal citation), that Plaintiffs have a clear liability case against solvent defendants. This point was addressed in the previous section of this opinion. The next material contention made on behalf of the Block objectors was that they had a contractual guaranty against losses (as did many class members) from Third Party Defendant H.P. Demery, a major contributor to the settlement. The Block objectors argued that the "settlement completely disregards the distinction between those who had the guaranty and those who did not and makes available Demery's assets, to a limited extent, for the benefit of all participants in the Dennis Greenman program". (Memorandum of Max Block, et al., filed May 10, 1985).

As set forth more fully in the discussion of Rule 23(b)(1) below, the investors who are members of Subclass I have been treated on a parity since the inception of this

case. The substantial fund of money recovered by the Receiver from the Becker accounts and elsewhere when Greenman's fraud was first discovered has been distributed equally to all such class members, providing them with a 35% return of their net losses, regardless of whether the losses were sustained at Merrill Lynch, Paine Webber, or Barclay/Becker. The commingled nature of the investors' accounts rendered it impractical or impossible to trace any individual's funds or how they actually fared in the option-trading in which Greenman was engaging. The settlement process had thus made no attempt to allot specific losses and liabilities among the defendants and third and fourth party defendants. Rather, a settlement fund was created comprised of the contributions of all participating parties.

The settlement agreement contemplates that all class members will participate to the same extent in the settlement funds without regard to the strengths or weaknesses they may have individually in their cases against the contributing parties. The Court finds this to be a fair and reasonable settlement term providing equal protection and benefit to all class members. The three Block objectors' individual claims to entitlement of 100% recovery because of the Demery guaranty (upon the merits of which the Court does not pass)—rather than the near 90% recovery contemplated by the settlement—is not sufficient reason to set aside the settlement.

#### d. *Guidelines for assessing the opposition factor*

The black letter law in this circuit teaches us that in assessing the fairness of a proposed compromise, the number of objectors is a factor to be considered, but a settlement can be fair notwithstanding a large number of class members who oppose it.

*Pettway v. American Cost Iron Pipe Co.,* 576 F.2d 1157, 1215 (5th Cir.1978). *See also Cotton v. Hinton,* 559 F.2d 1326 (5th Cir.1977). In *Reed v. General Motors Corp.,* 703 F.2d 170 (5th Cir.) a settlement approval order was affirmed despite objection by 600 out of 1500 class members and

23 of the 27 named plaintiffs, and in *Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799 (3d Cir.), *cert. denied,* 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974) a class action settlement was approved despite the fact that 22 percent of the class actively objected to it.

Here, while the *Baer* objectors were not quantified or identified with precision, it appears that at most the objectors are fifty in number. As there are 542 class members eligible to participate in the settlement fund, it appears that the objectors represent less than 10 percent of the class.

In light of the Court's determinations on the other factors bearing on the fairness, reasonableness, and adequacy of the settlement, the recommendations of counsel, and the fact that no evidence or expert testimony was presented by any of the objectors tending to demonstrate inadequacy or unfairness, the number and substance of the objections was not sufficient to warrant disapproval of the settlement. *Compare Bennett v. Behring Corp.,* 96 F.R.D. 343 (S.D.Fla.1982), *aff'd* 737 F.2d 982 (11th Cir. 1984).

#### 7. *The state of proceedings at which the settlement was achieved*

The Greenman litigation has been in progress for over four and a half years. The parties engaged in active discovery and legal briefing for two years. Thereafter, the focus of the parties' efforts were, with the Court's encouragement and support, directed towards settlement. Due to the complexities, not to mention the sheer logistics, of conducting settlement negotiations among well over a hundred parties, the settlement process was long and difficult. The Court's active participation was invoked frequently under the powers and duties conferred by Fed.R.Civ.P. 16. All of those proceedings and the record developed therefrom provided a sufficient basis for evaluating the settlement.

#### SETTLEMENT UNDER RULE 23(b)(1)

██ As a condition precedent to a settlement, the primary defendants have required that a mandatory class action be certified pursuant to Rule 23(b)(1) of the

Federal Rules of Civil Procedure. The settlement agreement does not permit a voluntary class action certification under Rule 23(b)(3). A 23(b)(1) settlement was fashioned to insure that all of the litigation arising from Dennis Greenman's activities is ended and that the defendants will have no further liability above the amounts they have agreed to pay. Indeed, the defendants are insisting on the protection from the establishment of incompatible standards of conduct provided by 23(b)(1)(A) [11]. Consequently, this Court is faced once again with the propriety of certifying the settlement of this cause under 23(b)(1) and whether such certification for the purpose of settlement was indeed in the best interest of all of the parties.

The Court is in the same posture today as in 1982 when it issued its Pretrial Order I certifying a mandatory class pursuant to Rule 23(b)(1). Once more the Court is standing where two roads diverge in a wood, and the one less travelled is again taken in approving a settlement that is fair, reasonable and adequate in providing class members nearly 90% of their total net investment.

Because the problems inherent in the mass personal injury situations—factual difficulties unique to various plaintiffs which destroy commonality, *In re Northern District of California, Dalkon Shield IUD Products Liability Litigation,* 693 F.2d 847, 844 (9th Cir.1982), problems in satisfying typicality, *see id* at 855, are not present in the unique facts before this Court, the Court concludes that Rule 23(b)(1) still provides the only logical, equitable and compellingly reasonable manner for concluding a complex securities case of staggering dimension.[12] Indeed, as this Court noted in Pre-Trial Order I, *In re Dennis Greenman Securities Litigation,* 94 F.R.D. 273 (S.D.Fla.1982), Rule 23(b)(1) was created to address instances where allowing class plaintiffs to opt out of class litigation presents special problems. For example, in instances where both (b)(1) and (b)(3) apply, courts have recognized that (b)(1) must govern to avoid a multiplicity of suits. *See Green v. Occidental Petroleum Corp.* 541 F.2d 1335, 1340 (9th Cir.1976) (citing *Mungin v. East Coast Railway,* 318 F.Supp. 720, 730 (M.D.Fla.1970), *aff'd. per curiam,* 441 F.2d 728 (5th Cir.1971)), (C. Wright & A. Miller, *Federal Practice and Procedure* (1771 at 7–8)). This cause presents just those special problems, and more, in permitting an opt-out procedure.

I recognize well that it is not for the District Court to chart new courses in the law. Our function is to apply existing precepts to the facts at hand. I have attempted to do so, but with a recognition that the recent cases and writings on the application of 23(b)(1) demonstrate an unrest with a wooden application of the rule and a recognition that the advent of mass litigation of various types requires innovative consideration of the rule. Perhaps it would be more appropriate and palatable to say that the full potential of the rule can be realized by carefully considered application in the

---

**11.** Professor Moore explains that certifications of a class under (b)(1)(A) are infrequent because it is rare that a defendant supports or does not object to, or in fact, favors the (b)(1)(A) class certification. 3B J. Moore & J. Kennedy, *Moore's Federal Practice,* § 23.35[1] n. 5 (2d ed. 1985). In this case the defendants not only support the 23(b)(1)(A) certification, but in fact are demanding such certification for settlement purposes only.

**12.** There is precedent for certifying a class for settlement purposes only. *See In Re Beef Industry Antitrust Litigation,* 607 F.2d 167 (5th Cir. 1979), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981).

This Court realizes that this issue need not necessarily be considered as if before the court on a full factual record presented for resolution at or after trial, since settlement classes have been approved where the propriety of class certification remained an issue. *E.g., Officers For Civil Justice v. Civil Service Commission,* 688 F.2d 615 (9th Cir.1982), *cert. denied,* 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983); *In Re Chicken Antitrust Litigation,* 560 F.Supp. 957, 960 (N.D.Ga.1980). Given that defendants have frequently stated their lack of interest in this settlement without the non-opt provision afforded by Rule 23(b)(1) (which this Court is fully able to understand, at least at the settlement levels now achieved, based on extensive opportunity to observe the negotiations first-hand), it cannot be said that this critical element of the settlement is not fair, reasonable and adequate as a matter of law and fact.

resolution of cases such as this instant one. Rather than offending due process principles, using 23(b)(1) in the furtherance of such principles, and, indeed, for the real protection of the rights of the unfortunates caught up in such a scheme and the ultimate complex of litigation is required to do justice in this case.

Reserving for the moment the strong policy reasons that demand termination of the cause in this manner, I shall discuss why settlement pursuant to 23(b)(1) meets the criteria required by the Rule.

As set forth in Pretrial Order I, the four criteria in Rule 23(a) must be satisfied prior to application of the non-opt out provisions of (b)(1)(A) or (B). The Court finds once again that there are questions of law and fact common to the class. All of the members of the class, individually, in partnerships, corporations or other entities, invested monies, securities and other items of value in some fashion with Dennis Greenman while he was conducting his scheme at Merrill Lynch, Paine Webber, and Barclay through Becker. All of the class members were victimized by Dennis Greenman in suffering net losses of principal from their investment or consequential and nominal damages. Similarly, the claims of the representative plaintiffs are typical of the entire class and differ only in the amounts of damages they suffered. As to adequacy of representation, the Court's familiarity for over four years with this litigation and the counsel who have vigorously asserted the claims of the representative plaintiffs, make it evident that the representative parties have fairly and adequately protected the interests of the class. Before appointing the attorneys who constitute the Plaintiffs' Committee, I considered not only the parties represented by counsel but, necessarily, the experience and expertise of each attorney. Each was and is eminently qualified to do the work contemplated by the appointment. From the inception of this litigation they have protected the interests of the members of the class. The Revised Settlement Agreement demonstrates the protection of those interests by treating all recovering class members exactly alike. There has never been the least indication that the settlement is collusive. Adequacy of representation is more than satisfied. Finally, the more than 600 members of the class render joinder impracticable. Numerosity obviously has been met.

Having determined that the requirements of 23(a) are satisfied, the Court has also concluded that the additional criteria contained in Rule 23(b)(1) when considered in relation to the factual picture presented by this case, call for the certification of a (b)(1) class to accomplish this settlement. The fundamental purposes of Rule 23 are well served by the Revised Settlement Agreement and consequent Final Judgment under discussion. Inherent in Rule 23(b)(1) are considerations going far beyond the desire of a few who wish to, and can afford to, gamble not only with the result, but the cost and time of reaching whatever that end may be.

### *The Requirements of Rule 23(b)(1) are Satisfied*

Rule 23(b)(1) provides that a mandatory class action is appropriate when either of the following criteria exists:

When prosecution of separate actions would create a risk of

A. inconsistent or varying adjudications which would establish incompatible standards of conduct for the party opposing the class or

B. adjudication of individual claims would as a practical matter be dispositive of the interests of the other members of the class or substantially impair or impede their ability to protect their interests.

The Court finds both these provisions particularly applicable to the facts of this case where the nature and the extent of the fraud committed by Dennis Greenman has produced among the plaintiffs an identical financial injury—loss of principal investment—perpetrated by a systematic and homogeneous pattern of deception to conceal his heavy losses in the highly volatile options market. Greenman engaged in this systematic and homogeneous pattern of deception without regard to the individual

victim or his or her status, the brokerage house he was associated with at the time or the form or route of any particular deposit to the program. These factors create a cohesion among the claims of the individual plaintiffs for the recovery of their losses. Evidence presented to the Court during the course of this action revealed the elements that reacted to form this cohesion between the plaintiff class members. As word of Greenman's success spread, investors embraced Greenman's enticements with fervor. Investors relied upon one another for information and confirmation of Greenman's success. Investors communicated what they believed to be their phenomenal returns to friends, relatives, business associates and fellow church members. As the program and numbers of investors expanded, Greenman titillated prospective investors by proclaiming that few opportunities remained to participate in his arbitrage program. Anxious to share their good fortune, investors responded by taking matters into their own hands and depositing monies into their own accounts for the benefit of those who would otherwise be foreclosed from sharing in the bonanza. The entangled relationship among the investors, the historical development of Greenman's arbitrage program and the manner in which the investors fanned the flame of the spreading Greenman wildfire developed the cohesion, the mutuality of interest, among the over 600 investors.

This cohesion inextricably intertwines the ability of each individual plaintiff to recover his losses with that of other plaintiffs. Likewise, this cohesion among the claims of the individual plaintiffs risks the creation of incompatible standards of conduct for those liable to the plaintiffs for their losses should inconsistent or varying adjudications result from individual actions.

What does "incompatible standards of conduct" mean? Is this concept limited to cases in which injunctive action should reach or benefit all rather than some? Or to cases in which the result of a judgment should apply so simply and uniformly that "due process" is not offended by such action? In the most simple cases in which 23(b)(1) is properly applied, the same due process considerations apply as in the more complicated cases. Clearly, the application of the rule should and must involve a balancing of interests. If the rule is to have any practical and useful effect, we must look to its application in matters in which rigidity is tempered by the equitable considerations which gave rise to the rule, and in which "due process" is viewed in the light of the interests of the many and the fairness of the procedures employed.

As to the first criteria under 23(b)(1), i.e. inconsistent or varying adjudications resulting in incompatible standards of conduct for those opposing the class [13], the record before the Court demonstrates a likelihood of the establishment of incompatible standards of conduct for the brokerage house defendants should the prosecution of separate actions be permitted. The plaintiffs contend that every sale of a unit in the program was illegal and void, because the program was not registered under the Securities Act, because the program was not registered under the Investment Company Act, and because units were placed in the market as legitimate investment vehicles when, in fact, it was illegal to place the units in the market under what has commonly become known as the "fraud on the market" theory. *Shores v. Sklar*, 647 F.2d 462 (5th Cir.1981) (en banc), *cert. denied*, 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983) and *Lipton v. Documation, Inc.*, 734 F.2d 740 (5th Cir.1984). Individual adjudications of these issues would create a risk of inconsistent holdings on the duties of the defendant brokerage houses, for example, to register the program under the Securities Act when, in fact, due to the cohesion among the class members it could be said that the

---

**13.** "It seems obvious that "the party opposing the class" means "the party opposing the claims of the class" and does not mean the party who is taking a strategical position opposing the maintenance of the action as a class action." 3B J. Moore & J. Kennedy, *Moore's Federal Practice,* § 23.35[1] n. 5 (2d ed. 1985). In this case, "the party(ies) opposing the class" are the defendant brokerage houses and other defendants.

duties are the same as to each member of the class.

Likewise, under the second criteria in 23(b)(1)(B), it cannot be gainsaid that an adjudication obtained by a single member of the class that units of the program purchased by that investor were legitimately in the market would not substantially impair or impede the ability of the other investors to prove that the units they purchased appeared in the market illegally. In the controlling settlement document, the several actions filed have been noted. Three different federal circuits are involved, as well as different state trial courts. Passing for the moment, the anticipated longevity of these many actions, including a third and fourth party complaint, if the Court is required to abort this settlement because of the dissident few, the potential is shocking. Let us for example (and skipping past the naivete of a conclusion that the class has a "slam dunk" case) examine the course open to the parties. An action tried in the District of New York, or the District of New Jersey could result, not only in conclusions antithetical to the class on a factual basis—but as a matter of law as well. What consequences, if any, such result would have on pending actions here, both practically and legally, would, no doubt, give rise to additional litigation and perhaps unfortunate consequences for the remainder of the class.

What would be the effect of a plaintiffs' win on substantially the same issues in the other districts or states? Further, because of timing of investments with different defendants, including the situs of investments (and the state court pendent claims must be considered), the possibility of both inconsistent standards as well as impaction "as a practical matter" on certain class claims with the resultant impairment of the ability of some class members to protect their interest, cannot be ignored.

Whether or not the determination in one individual action on these unitary issues would be binding as a matter of law in a subsequent individual action, the determination in the prior action would as a practical matter create a predisposition to a similar determination in a subsequent action.[14]

In the present case, this Court authorized Hugo L. Black, Jr., as Receiver, to take possession of the assets belonging to all of the investors in the fraudulent Greenman Program and to attempt to recover missing assets. The Receivership is unique in that the Receiver has been representing the investors and their accounts rather than simply managing an ongoing business.

The Receivership was structured in this manner because the investors' funds have no integrity and such funds were commingled hopelessly in all of the accounts by Greenman. Thus, one of the first findings this Court made was that the fund, created by the Receiver and later increased by recoveries made by the Receiver and the class action plaintiffs' committee, belonged equitably to all investors who lost money in the Greenman program. The fund has consistently been treated in this manner. The Court, in aid of its jurisdiction, has protected the fund against unfair advantage and has distributed from this fund to the defrauded investors 35% of their net principal losses irrespective of the accounts or brokerage houses [i.e., Merrill Lynch, Paine Webber, and A.G. Becker] into which the investors originally made their deposits.

---

**14.** One court has approved the application of Rule 23(b)(1) to complex securities litigation. In *Parish v. Boetel & Co.,* 60 F.R.D. 680 (D.Neb. 1973), the court certified a mandatory class under Rule 23(b)(1) in a case involving 900 limited partners in 16 limited partnerships suing a registered broker dealer who sold the partnership units.

In support of the mandatory class action the district court stated:

It is entirely possible that the defendants in separate actions could be subjected to conflicting and incompatible adjudications. For example, the defendant *Boetel & Co.* could be placed in the position of offering recission in one action, paying damages in another, and being temporarily enjoined from doing either in a third action. Under such circumstances, the rights of other members of the class who were not parties to the litigation could be substantially impaired or impeded.

*Id.* at 681.

At the Court's direction, monies from the fund have also been used to pay for all of the costs of the Receivership and the class action litigation to date. The fund still exists today and now includes the settlement contributions made by the parties. It is the source of the settlement proceeds which will be distributed to all investors who lost money as a result of the Greenman fraud. The Court, in aid of its jurisdiction, has previously protected this fund and will continue to do so until this litigation is terminated. Thus, the Court has concluded that certification under Rule 23(b)(1) will aid in protecting, managing and equitably distributing this fund.

A number of adverse consequences would result from failing to certify a mandatory class action in this case. To date, investors who invested at Merrill Lynch and Paine Webber as well as A.G. Becker have been treated on a parity with those who invested only at A.G. Becker. In other words, money found in the A.G. Becker accounts was used to pay all investors, even though some investors sustained most of their losses at Merrill Lynch or Paine Webber.

If individual suits are not permitted, A.G. Becker cannot claim as a setoff against investors who invested solely through it, the monies already paid to claimants who sustained most of their losses at Merrill Lynch or Paine Webber. Thus, A.G. Becker will be prejudiced because it no longer has available the funds it paid to Merrill Lynch and Paine Webber investors to satisfy the claims of persons who invested through A.G. Becker. This type of prejudice can only be avoided through the use of the mandatory class action vehicle.

To abolish a mandatory class action would also have several devastating consequences to the vast majority of class members who are in favor of settlement. To begin with, the settlement in this case has been conditioned by the primary defendants to a Rule 23(b)(1) settlement. In the event this Court or the Eleventh Circuit destroys its mandatory nature, many of the contributors—including the major defendants—are permitted contractually to withdraw their settlement contributions and

they have previously assured the Court that they will do so.

A further adverse consequence of failing to certify a mandatory class action is that many investors may be prejudiced in terms of sources of recovery and in terms of the amount of recovery. Some investors may bankrupt certain potential sources of recovery, such as H.P. Demery, before others have a chance to go to trial against Mr. Demery, while suits against other defendants may be unsuccessful. Thus, for example, a defense verdict for A.G. Becker would preclude A.G. Becker's investors from recovering contributions from, e.g., Merrill Lynch and Paine Webber. This would be inequitable because the funds recovered from the A.G. Becker accounts have already been used to benefit investors who sustained substantial losses at Merrill Lynch and Paine Webber. The same can be said for settlements by others, such as the two million dollars recovered from Metropolitan Bank. Investors who had nothing to do with the Bank have received a portion of those funds through the Receiver's initial distribution and they have been benefited by the payment of some of the costs of this litigation with those funds.

After consideration of all requisite criteria, the Court has found this settlement to be fair, reasonable and adequate and supportable under the criteria set out in Rule 23(b)(1). It logically follows that the Court should not allow the settlement to be destroyed, with no reasonable certainty of a greater recovery, simply because a few class members want more.

### Opposition to the mandatory class certification

The *Baer* plaintiffs have cited two recent cases, among others, which they assert make a 23(b)(1) class action inappropriate. *In re Bendectin Products Liability Litigation*, 749 F.2d 300 (6th Cir.1984); and *In Re Northern District of California, Dalkon Shield IUD Products Liability Litigation*, 693 F.2d 847 (9th Cir.1982).

An examination of these authorities reveals that they do not preclude certification

under Rule 23(b)(1) and they do not answer the unique questions posed by this securities litigation.

In *In Re Bendectin Products Liability Litigation,* 749 F.2d 300 (6th Cir.1984), the Sixth Circuit granted a writ of mandamus and reversed a mandatory class certification under Rule 23(b)(1). The class was certified for settlement purposes and it included all persons exposed to Bendectin. After finding that the criteria for review by mandamus were met, the Court reviewed each of the elements of Rule 23(b)(1) in light of the facts contained in the record. The Sixth Circuit held that the requirements of Rule 23(b)(1)(A) had not been satisfied.

As to the merits of whether a mandatory class action certification is appropriate in mass tort cases, the *Bendectin* court commented as follows:

> Although we shall issue the writ, we realize that the district judge has been faced with some very difficult problems in this case, and we certainly do not fault him for attempting to use this unique and innovative certification method. On pure policy grounds, the district judge's decision may be commendable, and several commentators have argued that Rule 23 should be used in this manner. See, e.g., Note, Class Certification of Mass Accident Cases under Rule 23(b)(1), 96 Harv.L.Rev. 1143 (1983). Because of the situation presented by this case, however, we conclude that a writ of mandamus vacating the certification order of the district court should be issued.

749 F.2d at 307.

The second case cited by the *Baer* plaintiffs is *In Re Northern District of California Dalkon Shield IUD Products Liability Litigation,* 693 F.2d 847 (9th Cir.1982). In *Dalkon Shield,* the district court certified a nationwide class under Rule 23(b)(1) on the issue of punitive damages as to all persons injured by the "Dalkon Shield" IUD. A California statewide class was also certified on the issue of liability pursuant to Rule 23(b)(3).

The Ninth Circuit reversed the class certification but stated as follows:

> We are not necessarily ruling out the class action tool as a means for expediting multi-party product liability actions in appropriate cases, but the combined difficulties overlapping from each of the elements of Rule 23(a) preclude certification *in this case.*

693 F.2d at 851.

It is also significant to note that the *Dalkon Shield* court discussed and approved class actions for certain types of mass tort litigation "... such as an airplane crash or a cruise ship food poisoning [where] proximate cause can be determined on a class-wide basis ...". 693 F.2d at 853. The Court was also careful to emphasize that "[i]n products liability actions, however, individual issues may outnumber common issues". 693 F.2d at 853.

The Ninth Circuit merely rejected the use of a mandatory class action in the products liability case because the various elements of Rule 23(b)(1), which must be satisfied, were not supported by the record. In the present case, we have a differing set of circumstances than those which precluded certification in *Dalkon Shield.*

Another recent case which involves Rule 23(b)(1) is *In Re Federal Skywalk Cases,* 680 F.2d 1175 (8th Cir.1982). There, the district court certified a mandatory class under Rule 23(b)(1)(B), of all business invitees injured at the Hyatt Regency Hotel in Kansas City when two skywalks collapsed. The class was certified for the purpose of trying the common issue of punitive damages. The district court also certified, under Rule 23(b)(1)(A), the same class for the purpose of trying compensatory and punitive damages.

The Eighth Circuit reversed the district court on the ground that the certification violated the Anti-Injunction Act, 28 U.S.C. § 2283, because the effect of the certification was to enjoin prior pending state court actions. The Court reasoned that the exception to the Anti-Injunction Statute which permits an injunction where it is "necessary in aid of [the Court's] jurisdiction" was not applicable because there was no *"limited fund"* in existence which the Court was compelled to protect. The Court

held that identifiable property and not a *potential* to recover damages for pecuniary injury was necessary to create a fund. Significantly, in footnote 4, the Court was careful to point out that it did not reach the merits of the contention that class certification was the appropriate device to handle the claims arising out of the disaster. 680 F.2d at 1182.

The decision in *Skywalk* is simply not applicable here. No plaintiff class member who filed suit in a state court action objected to the 23(b)(1) settlement on the basis of the Anti-Injunction Statute or has sought leave to appeal that decision pursuant to 28 U.S.C. § 1292(b).

In any event, it is important to note that in the 2–1 decision, the majority commended Judge Wright's "... creative efforts in attempting to achieve a fair, efficient and economical trial for the victims of the Hyatt Regency disaster". 680 F.2d at 1184. The majority also stated:

We note that several commentators, including Professors Moore, Wright and Miller, also maintain that class actions are particularly appropriate for disposing of mass accident litigation. *See comment, Mass Accident Class Actions*, 60 Cal.L.Rev. 1615, 1616 n. 7 (1972)."

680 F.2d at 1184. In his dissent, Judge Heaney found that the Anti-Injunction Statute was not violated because it was not intended to apply to mandatory class actions. Judge Heaney reasoned that in certifying a mandatory class, a federal court is required, *in aid of its jurisdiction*, to preclude class members from pursuing pending state proceedings, which is an exception to 28 U.S.C. § 2283. Judge Heaney also concluded that the district court's class action certification satisfies all of the requirements of Rule 23. The Eighth Circuit divided 3–3 on rehearing en banc and thus, the original panel decision stood. *In Re Federal Skywalk Cases*, 95 F.R.D. 479, 482, n. 7 (W.D.Mo.1982).[15]

**15.** Significantly, in an article written by Robert C. Gordon, Esq., co-lead counsel in *Skywalk,* "The Optimum Management of the Skywalks Mass Disaster Litigation by Use of Federal Mandatory Class Action Device", 52 UMKC L.Rev. 215, the subsequent history of the case was detailed. In footnote 45 it was noted that although the Eighth Circuit split 3–3 all seven federal judges who passed on the issue (which includes the district judge) agreed that such a class action was the best choice. In addition, the commentary notes that:

"Judge McMillan [author of the 2–1 opinion] may already have second thoughts about the wisdom of his support for applying the Anti-Injunction Act to a mandatory federal class action situation. In fact, only a short time later in August, 1982 when presented with a case involving the federal courts and the State of Missouri takeover Bid Disclosure Act, Mo. Ann.Stat. § 409.500—.565 (Vernon 1979 & Supp.1983), he refused to go along again with Judge Arnold's concept of the Anti-Injunction Act. *See National City Lines v. ULLC Corp.* 687 F.2d 1122, 1127–28 (8th Cir.1982). Judge Arnold's dissent in National City Lines specifically notes, in vain, Judge McMillan's support in *In re Federal Skywalk Cases,* 687 F.2d at 1135 (Arnold, J., dissenting). Perhaps, in time, even Judge Arnold will recognize that the Anti-Injunction Act of 1793 cannot, and should not, be used to destroy, nearly two centuries later, the utility of mandatory class actions in the wake of unprecedented disasters."

*Id.* at 231, n. 45.

As further noted by the author,

"Several recent articles in leading legal journals have uniformly praised Judge Wright's and Judge Heaney's perception of the best interests of the judicial system. The same articles have lambasted Judges McMillan and Arnold for vacating the initial mandatory class ruling. The Eighth Circuit's holding is accurately described as "unreasonable," "untenable," "arcane," "obscure," "unnecessarily narrow," and "inequitable". The recent article in the Harvard Law Review concludes with the warning that:

If class certification ... continues to be denied unreasonably [as the 8th Circuit did when it vacated Judge Wright's plan], Rule 23 should be reformed to address the problems of mass accidents. The potential of class Rule 23(b)(1) should not be ignored at the expense of burdening the judicial system and treating victims unfairly.

*Id.* at 231.

"In the August 1983 issue of the Michigan Law Review, the true interests of the judicial system are shown to be best served by the mandatory class approach:

In the mass-accident context, staying state court proceedings in favor of a single federal class action does no more than protect both plaintiffs and defendants against the improvident insistence on individual punitive damages by courts sympathetic to local claimants. Viewed as a remedy for arbitrary and inequitable assessment of punitive damages in di-

The Court is mindful of the due process issues that arise in a mandatory 23(b)(1) settlement. The right of the individual to proceed with his own case and counsel is a dear one. Nevertheless, that right must be balanced against society's interest in a fair and efficient resolution of a complex securities litigation possessing the potential for years of litigation accompanied by risk and uncertain recovery to the plaintiffs in this cause. Subject to an appeal, monies are available now for distribution to the recovering class members.

When this Court first issued its Pretrial Order I, it did so in a manner sensitive to the protection of the due process rights of all class members. The Court appointed a Plaintiffs' Steering Committee (Plaintiffs' Committee) of counsel experienced in class action litigation. All remaining attorneys of record served on the Advisory Committee which was empowered, if requested, to advise the Plaintiffs' Committee in the areas of strategy and to aid the Committee in the preparation of motions, briefs and to participate in discovery. 94 F.R.D. at 283. Pre-Trial Order I also provided that those advisory counsel disagreeing with the Plaintiffs' Committee bring such disagreement directly to the Court. *Id.* Indeed, this Court has practiced an "open-door" policy to all counsel involved in this cause since this suit began.

Similarly, the Court and counsel involved in the settlement negotiations have taken care to protect absent class members. Notice of the Fairness Hearing and copies of the settlement agreement with a letter explaining the provisions of the settlement and the mechanisms for submitting claims, were provided to all absent class members individually and by publication. All class members were notified of their opportunity to appear at the Fairness Hearing and object either in person or in writing. Other than the objectors mentioned earlier in this opinion, none of the absent class members disputed the fairness of the settlement.

At the time the Court entered Pretrial Order I, the Court was concerned with the consequences of permitting individual suits to go forward. Those concerns are just as compelling today. Extensive discovery will be necessary before any of the 35 or 40 actions may proceed to trial. Although the Plaintiffs' Committee has deposed most of the defense witnesses, the defendants claim they have not had the same opportunity to depose class members. Given the complex and interrelated nature of claims on behalf of many of the class members, the large number of third party actions and the congested criminal and civil docket of this Court, it is clear that the first trial may be years away. Adding to these considerations, the almost certain interlocutory and final appeals, the actuality of plaintiffs receiving monies in hand becomes more and more remote.

The spectre of attorneys' fees troubled this Court in Pretrial Order I:

I can discern no reason why the investors, many of whom have been hurt badly already, should now be required to expend additional hundreds of thousands of dollars to support a wave of lawsuits and the fertile imaginations of the attorneys whose individual tasks may draw them in different directions.

94 F.R.D. at 278. That spectre continues to haunt this Court today.[16] Indeed, able

---

versity cases, the mandatory class procedure falls well within the statutory exception defined by *Mitchum v. Foster.*

... *Future courts, following the Federal Skywalk Cases dissent, should look to the realities of the litigation,* and recognize that probable liability sufficient to create a limited fund under Rule 23 also brings a mandatory class within the 'aid of its jurisdiction' exception.

To protect plaintiffs' interests, the court should certify a Rule 23(b)(1)(B) class action for punitive damages. *Rule 23(b)(1)(B) solves the limited fund problem by joining and protecting all interested plaintiffs by insuring that the punitive judgment against the defendant*

*will be well-calibrated, and by promoting judicial economy.* Moreover, a careful analysis of the Anti-Injunction Act ... indicates that principles of federalism do not preclude this class action solution (emphasis added)."

*Id.* at 232 (quoting Note, *Class Actions-Punitive Damages,* 81 Mich.L.Rev. 1787, 1812, 1813, 1816 (1983)).

**16.** Commentators have reported the staggering attorneys fees and reduced recovery for class members that followed the demise of the 23(b)(1) certification in the *Skywalk* case:

"In real dollars and cents, the entire legal fees for handling all of the *Skywalk* litigation, in-

counsel for one of the defendants aptly characterized this litigation should the mandatory settlement be dissolved as "the lawyers' relief act." The parties who will likely benefit the most from permitting individual suits to go forward will be the lawyers who will vigorously pursue and defend them.

Hopefully, these considerations demonstrate why evaluation of the propriety of a 23(b)(1) settlement directs the Court to the fairness and adequacy of the settlement at hand. The nightmarish consequences of abandoning the (b)(1) vehicle become magnified in the face of a settlement that is remarkable in the amounts of money the recovering class members will receive. The Court is unaware of any settlement of a like kind which provides for distribution of near 90% return of the investors' losses.

The time has come for a rational and practical resolution of this complex securities litigation. The unique facts of this cause applied under the provisions of 23(b)(1) and the consequences of permitting any other vehicle for resolution demand that this massive securities litigation end in a mandatory class action settlement. For the foregoing reasons, the Court has certified this settlement under Rule 23(b)(1). No other reasonable alternative exists.

cluding a full-blown trial on punitive damages and a subsequent appeal by defendants, should have amounted at most, in the author's opinion, to $2,000,000 or two percent of the damages awarded, *whichever was less.* As it turned out, the individual attorneys, by helping defendants vacate the first class action (the mandatory Rule 23(b)(1) class) and then later helping defendants to moot the second class action (a voluntary Rule 23(b)(3) class), also unavoidably helped reduce the total amount of potential recovery for the victims from $500,000,000 to $100,000,000 while at the same time the non-class action attorneys' fees increased to about $30,000,000 for representing 300 or so victims. Moreover, none of the anti-class counsel who shared in the $30,-000,000 of fees had to establish compensatory

or punitive liability on the part of any defendant. By contrast, the federal class action attorneys received, in the aggregate, $1,500,000 in fees for representing over 2,000 claimants. Moreover, the federal settlement was structured so that not a single victim's recovery was reduced by one penny. The point that is raised here is not that the federal class action attorneys were paid too little (to the contrary, we were adequately compensated) but rather to question what the victims really got for the $30,000,000 that went to their personal attorneys out of the individual victims' recoveries. Is that fair? Is that really the best the system can do?" Gordon, "The Optimum Management of the Skywalks Mass Disaster Litigation by Use of Federal Mandatory Class Action Device", 52 UMKC L.Rev. 215, 225 (1984).