**In re CHICKEN ANTITRUST LITIGATION.**

Civ. No. C74–2454A.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 7, 1980.

ORDER

O'KELLEY, District Judge.

While it is still too early to celebrate the slaughter of the chicken cases, at long last the end is in sight. Begun in early 1974 as a single class action on behalf of a nation-wide class of governmental entities, this antitrust suit snowballed until thirty-three civil actions for treble damages and injunc-tive relief had been filed against the Na-tional Broiler Marketing Association (NBMA) and forty-one other defendants. Pursuant to 28 U.S.C.A. § 1407, these cases were consolidated for pretrial purposes be-fore this court, *In re Chicken Antitrust Litigation,* M.D.L. No. 237 (N.D.Ga. No. C74–2454A), and were then brought as a class action on behalf of the named plain-tiffs and other broiler purchasers. The court later permitted these suits to proceed as a class action for the purposes of settle-ment.

The plaintiffs charged in unison that the NBMA and forty-one companies, including both NBMA members and alleged non-member co-conspirators, had violated sec-tion one of the Sherman Act, 15 U.S.C.A. § 1, by combining for the unlawful purpose of fixing prices and restraining production of broiler chickens. At the heart of these accusations was the "conference call" pro-gram instituted by the NBMA for the bene-fit of its members and certain non-member chicken processors. Pursuant to this ar-rangement, the marketing committee of the NBMA collected and analyzed supply and price information furnished by the partici-pants. On the basis of this data, "suggest-ed" prices and production levels were for-mulated and passed on to the cooperating processors every week through the confer-ence call network. A market level, at a specific price, was recommended for each major city in which the processed chickens were sold. The plaintiffs contended that by curbing production and coordinating their marketing, the defendants succeeded in "fixing" the market price for their product.

In defense of their program, or, more precisely, in defense to these charges, the defendants argued that the activities of the NBMA fell within the antitrust exemption created by the Capper-Volstead Act, 7 U.S. C.A. §§ 291–292, which allows "farmers" to "act together . . . in collectively processing, preparing for market, handling and market-ing" their products. In addition to their claim to a threshold exemption the defend-ants asserted that these suits would be un-manageable as a class action and therefore should be denied class certification and that the plaintiffs could not prove any damages attributable to the conference call program. Some defendants also filed antitrust coun-terclaims against named plaintiffs and their purchasing agents and, conditionally, against class members.

These arguments raised formidable ques-tions for the court to decide. Rather than incur the expense of protracted litigation, however, the defendants—without admit-

ting liability—have entered into a number of settlement agreements with the plaintiffs, which the parties have now offered to the court for its approval pursuant to rule 23(e) of the Federal Rules of Civil Procedure. For the most part, the plaintiffs negotiated separately with each defendant, and, therefore, the provisions of the agreements vary somewhat; but roughly speaking, their terms, as contained in the class notice approved by the court on May 25, 1979, are as follows:

(1) Each settling defendant must deliver to the Settlement Committee cash, checks or notes or a combination of these worth the prescribed sum. For some defendants, partial payment of this sum may be made in broilers.

(2) Any Settling Defendant has the option to withdraw from its Settlement Agreement under certain circumstances after the deadline for filing written exclusions has passed, if, among other things: (a) potential claimants who purchased a certain amount of Broilers during the relevant period elect to be excluded from such classes; (b) any Court alters, amends or denies certification of any of the settlement classes; or (c) the Court denies approval of the Settlement Agreements.

(3) Some Settling Defendants may hold back up to four percent (4%) of their individual settlement obligations if new complaints, which are not encompassed within these settlement classes, are filed before final distribution of the Settlement Fund.

(4) All sales of Broilers by Settling Defendants shall remain in these consolidated cases as part of the claims of the Settling Plaintiffs for alleged damages asserted against any defendant remaining in the case.

(5) If the Court approves the settlements, a judgment shall be entered, among other things,

(a) Approving the settlements as fair, reasonable and adequate and binding on all class members who have not theretofore filed timely requests to be excluded, and directing their consummation in accordance with their terms;

(b) Dismissing all claims as set forth in the Settlement Agreements;

(c) Releasing, among others, the Settling Defendants, except NBMA, their predecessors, successors, parents, subsidiaries and affiliates from all claims as provided in the Settlement Agreements;

(d) Reserving jurisdiction over the administration of the settlements;

(e) Dismissing all counterclaims as provided in Section I of this Notice.

Notably absent from these agreements is any provision for the distribution of the settlement fund among the plaintiff classes. In fact, these settlement agreements were negotiated without any reference to the manner in which the funds would be allocated among the various classes. This void, however, has been tentatively filled by an inter-class sharing proposal drafted among the plaintiffs. As the class action notice indicates, the approval *vel non* of the inter-class sharing proposal is a separate issue, one which the court will consider at a later date. The sole issue to be addressed here is whether these proposed settlement agreements should be approved by the court.

 At the hearing held on November 19, 1979, the court gave its tentative approval to these settlements. Of special significance in this regard was the absence of any objections to the terms of these agreements, which would seem to indicate that the settlements were satisfactory to all those affected. Notwithstanding this unanimity, the court feels it wise to first construct a basis for its decision along the lines suggested by prior decisions. While the courts would prefer that parties determine their rights among themselves, this encouragement should not come at the expense of a party's rights. As a matter of course, once a dispute is brought before the court, the vestments of due process attach, and the suit may not come to an end without the court's consent. The approval of even an unopposed settlement can be no less critical than a decision on the merits after a full trial, because a settlement may just as

easily compromise the rights and expectations of a class member. Therefore, the court must be certain that the procedural requirements for approving a settlement and the substantive rules affecting this exercise of the court's discretion are strictly observed. In fulfilling this responsibility, however, it is unnecessary for the court to assume the role of devil's advocate in order to restore an adversarial climate, raising possible objections to the agreements only to reject them out-of-hand; all that is required is for the court to assess the settlements under the appropriate standard.[1]

To this end it is well settled that a proposed settlement, taken on the whole, need only be fair, adequate, and reasonable in light of the interests of all the parties and not the product of fraud or collusion, to meet the court's approval. In satisfying itself that this standard has been met, the court should weigh the relative advantages and disadvantages of the agreement and analyze the relevant facts and law with an eye towards the terms of the settlement, but without reaching ultimate conclusions on the issues underlying the dispute or substituting its business judgment for that of the parties. The court's task is one of balancing the probabilities, not assuring that the plaintiff class receives every benefit that might have been won after a full trial.

Accordingly, the court begins its inquiry where the parties began their endeavor. It is fair to say without disparaging the plaintiffs' claims or their counsel that this suit was fraught with difficulty from its inception. To begin with, the suit was very complex, logistically speaking. While securities and antitrust lawyers might disagree over which kind of case is most difficult, generally all would agree that antitrust litigation presents a trying task for even the most accomplished trial attorney. This element of complexity, which has come to be expected in every action of this type, was compounded in the present case by the large number of parties, the multiple issues, and the sheer weight of the pleadings. After sifting through the membership lists of NBMA, the plaintiffs singled out the most "attractive" defendants, ending up with forty-one companies and the association. Just cataloguing all the pleadings filed by these parties from this point on proved to be an awesome responsibility. What the court was wrestling with, however, was only the modest beginning of an impending deluge of paper. The settlement negotiations were completed at about the time discovery on the class certification issue was winding down, but before discovery on the merits and damages had even begun. Clearly, the investments of judicial and private resources necessary to bring this case to a close were it to go to trial would have been substantial.

And the problems loomed even larger once the plaintiffs' case was broken down into its components. One of the most pressing issues was whether this suit should be certified as a class action. The plaintiffs hoped to present their claims as representatives of a class consisting of all direct and indirect purchasers of the defendants' broilers, but first they had to show that the requirements of rule 23 were satisfied. While the court ultimately certified the putative classes for the purposes of settlement, throughout the discovery on the class certification issue it expressed serious doubts that resort to representative procedures would be appropriate in a case of such differing competitive climates. Although all the plaintiffs were consumers of the defendants' product, the similarity for the most part ended there. Some of the

1. The principles governing this phase of the proceeding were distilled from *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157 (5th Cir.1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979); *Cotton v. Hinton*, 559 F.2d 1326 (5th Cir.1977); *Girsh v. Jepson*, 521 F.2d 153 (3d Cir.1975); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir.1974); *Florida Trailer and Equipment Co. v. Deal*, 284 F.2d 567 (5th Cir.1960); *In re Armored Car Antitrust Litigation*, 472 F.Supp. 1357 (N.D.Ga.1979); *McNary v. American Savings and Loan Ass'n*, 76 F.R.D. 644 (N.D.Tex. 1977). *See generally* 7A Wright & Miller, *Federal Practice and Procedure* § 1839, at 432–33 (1972); *Manual for Complex Litigation* § 1.46 (rev. ed. 1978).

plaintiffs purchased directly from the defendants, while others purchased further down the chain of distribution. Furthermore, it was common knowledge that the plaintiffs purchased in separate regional markets, that the price they might pay and the grade product they might buy varied from transaction to transaction, and that the defendants' competitors, who did not all participate in the NBMA conference call program, sold in these same regional markets. Under these circumstances, and on the authority of recent interpretations of the requirements of rule 23, the court reasonably could have denied the plaintiffs' motion for class certification. Had this occurred, the "total peace" offered the defendants would have been undermined, and the bargaining power of the plaintiffs would have dissipated, and perhaps with it the hope of any settlement.

But even assuming that the plaintiffs surmounted this barrier, they still would have to establish the defendants' antitrust liability and their damages. During the course of the settlement negotiations, the risks of establishing the defendants' Sherman Act violations decreased significantly. The plaintiffs received a significant boost when the Supreme Court affirmed the Fifth Circuit's holding that the NBMA was not entitled to the antitrust immunity offered "farmers" under the Capper-Volstead Act. *United States v. National Broiler Marketing Ass'n,* 550 F.2d 1380 (5th Cir. 1977), *aff'd,* 436 U.S. 816, 98 S.Ct. 2122, 56 L.Ed.2d 728 (1978). While this decision certainly did not make the outcome on the liability issue a foregone conclusion, it did eliminate what had been up to this point the defendants' principal defense to the charge that their conference call program was in restraint of trade. The plaintiffs would still have to prove, though, that the defendants' alleged anticompetitive activity was the proximate cause of their claimed damages.

A more vexatious issue, one which plagued the plaintiffs through the negotiations of these settlement agreements, was proof of damages. Once its claim to a threshold exemption was rejected by the Supreme Court, the NBMA lost much of the tenacity it had shown in the early stages and appeared willing to capitulate to the plaintiffs', and the government's, demands to disband. With the organization dismantled, the plaintiffs' claim on its merits was only as strong as the positive proof of their damages. Although a just and reasonable approximation of the damage would suffice, recent decisions of the Fifth Circuit suggested that this estimate must be predicated upon reasonably solid ground. *E.g., Kestenbaum v. Falstaff Brewing Corp.,* 514 F.2d 690, 698 (5th Cir.1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976). In the prior suit commenced against the NBMA, the government sought only injunctive relief after studies by its experts on the poultry market strongly indicated that despite the considerable efforts of this organization, its impact on market prices was negligible. Understandably then, the plaintiffs were concerned that they would be unable to prove that the concerted activities of the defendants had any appreciable effect on the prices for broiler chickens paid by the plaintiffs. An economic consultant for NBMA had boasted that the defendants' collective efforts were the impetus behind a one cent per pound increase in chicken prices during the first nine months of NBMA's existence. But this admission, even if true, might not support a damage award based on that increment without further corroboration. The plaintiffs also discovered a memorandum prepared by NBMA economists that pegged damages at one-third cent per pound. Even the plaintiffs' own expert economist and statistician could not derive a more reliable per pound figure of damages from their thorough examination of the poultry market during this time period; they did conclude, however, that after taking into account monthly price fluctuations, the damages likely to have been attributable to the defendants' broiler shipments fell between 23 and 26 million dollars.

In the face of this uncertainty, any striving to negotiate separate settlement agreements for damages with multiple defend-

ants would have to be approached with trepidation. The plaintiffs hoped to circumvent this problem, though, by setting a target figure of 35 million dollars and apportioning this total among the defendants. The subtargets for each defendant were predicated upon its production figures and market shares and upon its relative ability to pay; the lion's share of the total was placed squarely upon the shoulders of the well-heeled defendants. The 35 million dollar figure was derived from a logical, and realistic, evaluation of the probable consequences of the defendants' activities: the time frame chosen stretched from January 1, 1971, when NBMA was formed, to March 31, 1973, when the government instituted its suit against the NBMA for injunctive relief; the market data was furnished by the defendants and studied by the plaintiffs' experts; and the price per pound increment applied to each defendant's production figures was determined only after the plaintiffs appraised its ability to pay. As a tribute to the success of plaintiffs' strategy, and to the credit of the Settlement Committee, the settlement fund, plus interest, exceeds the target figure.

As the foregoing discussion illustrates, the settlement agreements are the product of four years of good faith, arduous bargaining between well experienced counsel. Having explored the issues raised by their pleadings objectively, thoroughly, and intelligently, and assessed the probabilities of ultimate success, counsel for both sides agree that the settlements are well-advised and necessary. Notwithstanding the court's substantial involvement in the suit over the last five years, the parties' counsel are best able to weigh the relative strengths and weaknesses of their arguments. The court is not inclined to substitute its educated estimate of the complexity, expense, and likely duration of this litigation without a sound basis for concluding that the settlements are inadequate.

But even more indicative of the fairness, adequacy, and reasonableness of these agreements is the parties' unanimous consent. Pursuant to court order of May 25, 1979, notices were mailed to 218,900 prospective class members and published in eleven trade journals. Since that time, members of subclasses II–V, claiming aggregate purchases of $3.2 billion, have filed 2,404 separate claims. Of all these class members responding to the notices, none have registered any objections to the settlement agreements. Moreover, in the court's opinion, one of the most critical junctures in the settlement negotiations was reached when the court granted a motion filed by two of the defendants to strike the most-favored-nations clauses from all the settlement agreements. While not all the defendants demanded this protection, these provisions were considered indispensable by many of the early settling defendants who wanted to be certain that later settling defendants did not receive more favorable terms. That these agreements were finalized shortly thereafter without these clauses is testimony to the soundness of the agreements' terms.

Given the substantial size of the settlement fund, it is evident that, both in light of the best possible recovery and all the attendant risks, the settlement agreements are fair, adequate, and reasonable and not the product of fraud or collusion. Accordingly, the court hereby

(1) approves all the settlement agreements as binding on all the class members who have not filed timely requests to be excluded;

(2) directs the agreements' consummation in accordance with their terms;

(3) dismisses all claims as set forth in the settlement agreements, and all counterclaims as provided in section I of the notice approved by order of May 25, 1979, in Nos. 74–1257, 74–1557, 74–1594, 74–1595, 74–1632, 74–1654, 74–1783, 74–1829, 74–2043, 74–2044, 74–2131, 74–2204, 74–2330, 74–2366, 75–70, 75–71, 75–152, 75–362, 75–1079, 75–1293, 75–1294, 76–443, 76–474, 76–815, 76–1115, 76–1157, 76–1166, 76–1866, 76–2038, 77–476, 77–569, and 77–1693;

(4) releases, among others, the settling defendants, except the National Broiler Marketing Association, their predecessors,

successors, parents, subsidiaries, and affiliates from all claims as set forth in the settlement agreements; and

(5) reserves jurisdiction over No. 74–2454 for the purpose of administering the settlements.