**In re MOTORSPORTS MER-CHANDISE ANTITRUST LITIGATION.**

**No. MDL 1212.**
**No. CIV.A. 1:97CV2314TWT.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 14, 2000.

Mark E. Kraynak, Office of Mark Kraynak, Atlanta, GA, R. Stephen Griffis, phv, Office of R. Stephen Griffis, Hoover, AL, for Movants.

Martin D. Chitwood, Craig Gordon Harley, John Hinton, IV, Chitwood & Harley, Atlanta, GA, Joseph Opper, phv, Michael M. Buchman, phv, Milberg Weiss Bershad Hynes & Lerach, New York City, Edward M. Livingston, phv, Office of Edward M. Livingston, Winter Park, FL, Kearney Dee Hutsler, III, phv, Office of Kearney Dee Hutsler, Birmingham, AL, for Plaintiffs.

Emmet J. Bondurant, II, Jane E. Fahey, James Scott McClain, Bondurant Mixson & Elmore, Atlanta, GA, Charles E. Campbell, Jeffery W. Cavender, Long Aldridge & Norman, Atlanta, GA, Michael Eric Ross, Charles M. Shaffer, Jr., Jeffrey S. Cashdan, Barry Goheen, King & Spalding, Atlanta, GA, Thomas Willard Rhodes, Melanie Stephens Stone, Smith Gambrell & Russell, Atlanta, GA, C.B. Rogers, Tony Glen Powers, Rogers & Hardin, Atlanta, GA, Peter D. Coffman, Dow Lohnes & Albertson, Atlanta, GA, Timothy J. O'Rourke, phv, Dow Lohnes & Albertson, Washington, DC, David A. Ettinger, phv, Honigman Miller Schwartz & Cohn, Detroit, MI, Dennis Stewart, phv, Sharon T. Maier, phv, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA, William L. Tucker, Page Scrantom Sprouse Tucker & Ford, Columbus, GA, Halsey G. Knapp, Jr., Michael D. Robl, Foltz Martin, Atlanta, GA, Sylvia K. Kochler, Nelson Mullins Riley & Scarborough, Atlanta, GA, Joseph Opper, phv, Milberg Weiss Bershad Hynes & Lerach, New York City, Philip C. Gerard, phv, O'Connor Cavanagh Anderson, et al. Phoenix, AZ, Edward C. Winslow, III, phv, Brooks Pierce McLendon Humphrey & Leonard, Greensboro, NC, John A. Powell, phv, Powell & Deutsch, Asheville, NC, Ben Sirmons, phv, Robert A. Franklin, phv, Frazier Frazier & Mahler, Greensboro, NC, Robert J. Itri, phv, Gallagher & Kennedy, Phoenix, AZ, for Defendants.

*ORDER*

THRASH, District Judge.

This is a consolidated class action antitrust case transferred to this Court by the Judicial Panel on Multidistrict Litigation. Plaintiffs represent a class of purchasers of Defendants' merchandise. They allege a combination and conspiracy among Defendants to fix prices. The Court held a hearing on August 25, 2000, and verbally granted Plaintiffs' Motion for Final Approval of Proposed Class Action Settlements [Doc. 251]. This Order is entered to explain in detail the Court's reasons for approving the settlements.

## I. BACKGROUND

Plaintiffs, individually and on behalf of all others similarly situated, brought this antitrust class action under Sections 4, 12 and 16 of the Clayton Act, 15. U.S.C. § 15, 22 and 26, for injunctive relief and treble damages. Plaintiffs allege that Defendants have engaged in a combination and conspiracy to raise, fix, and maintain prices for merchandise sold at professional stock car races sanctioned by the National Association for Stock Car Auto Racing, Inc. ("NASCAR"). Plaintiffs represent a class of people who have purchased souvenirs and merchandise sold by Defendant vendors and/or their co-conspirators at inflated prices due to a price fixing conspiracy during the period from January 1, 1991 to December 31, 1999. As a result, the Plaintiffs assert that they and the members of the class have been injured in their business and property.

The NASCAR Winston Cup is an annual series of more than 30 races held at speedways in and around the country. Souvenirs and merchandise offered for sale at NASCAR Winston Cup races are manufactured in different states and transported in interstate commerce to speedways for sale to racing spectators. NASCAR is a promoter and the world's leading sanctioning body of professional stock car racing, including the annual Winston Cup and Busch

Grand National Series.[1] The Defendants consist primarily of independent vendors licensed to sell stock car racing souvenirs and merchandise at NASCAR Winston Cup races.

NASCAR regulates and licenses its membership, including drivers and their crews, team owners, speedway owners and corporate sponsors. The majority of souvenirs and merchandise are licensed by either NASCAR, the speedway, or the sponsor associated with the particular name, trademark, image or likeness represented on the item. The licensee pays the licensor a percentage of gross receipts from sales of the licensed merchandise. To sell souvenirs and merchandise at NASCAR Winston Cup races, all vendors must be licensed by the speedway or by an affiliate or subsidiary of the speedway. A vendor is required to pay the speedway a fee for each NASCAR Winston Cup event and a percentage of its gross sales. The speedway, in turn, must pay a percentage of its gross receipts to NASCAR.

In their Second Amended Complaint, the Plaintiffs assert that the Defendants and their co-conspirators, beginning as early as January of 1991, engaged in an unlawful contract, combination, or conspiracy in restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Plaintiffs allege that the Defendants combined, agreed and conspired to fix prices by (1) entering into written and/or oral agreements to fix the minimum prices of souvenirs and merchandise sold to customers at NASCAR races; (2) circulating and distributing price lists fixing the minimum prices of these souvenirs and merchandise; (3) meeting secretly before NASCAR races and agreeing to fix the minimum prices of these souvenirs and merchandise; (4) monitoring the prices at which souvenirs and merchandise were sold at the races; and (5) disciplining and punishing vendors who violated the price-fixing agreement. The Plaintiffs further allege that the Defendants fraudulently concealed the existence of the price-fixing conspiracy, thereby tolling the running of the applicable statute of limitations. The Plaintiffs sought declaratory and injunctive relief, treble damages, and attorneys' fees pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

After extensive discovery, the parties have reached settlement agreements in the case. The settlements provide that Defendants will pay more than $5.6 million in cash and issue more than $5.7 million in coupons to the class. There are four individual settlement agreements ("A", "B", "C", and "D"), each with a three tiered allocation plan. In general terms, each provides that the cash (after deduction of attorneys' fees and expenses) will be distributed first to class members with proof of qualifying purchases. Plaintiffs who can prove attendance at qualifying races but with no proof of qualifying purchases receive the next distribution of cash. Finally, the last group of plaintiffs to receive cash are those members who submit sworn claims (but no other proof) of qualifying purchases. Coupons will be allocated in a manner similar to the cash; however, the precise terms of the coupon programs differ for the various Defendants involved. The final allocation plan will be submitted to the Court for approval after the deadline for submitting claims.

The Group A Defendants (Americrown Service Corp.; International Speedway Corp.; and Motorsports International Corp.) have agreed to pay $3,467,500.00 in cash (the "Group A Cash") and to honor coupons (the "Group A Coupons") with a total redeemed value of $4,350,000.00. Group A Coupons entitle the bearer to a 25% discount off the purchase price of goods, up to a maximum $5.00 discount, and up to five coupons may be aggregated

---

1. By order entered May 12, 1998, the Court dismissed NASCAR as a Defendant in this case.

for a single purchase. The Group B Defendants (Action Performance Companies, Inc.; and Robert Yates Promotions, Inc.) have agreed to pay $1,858,000.00 in cash (the "Group B Cash") and to honor coupons (the "Group B Coupons") with a total redeemed value of $1,070,000.00. Each Group B Coupon entitles the bearer to a discount of $15.00 off the purchase price of goods, and several items may be combined to reach the $15.00 amount. Three of the Group C Defendants (Hooters of America, Inc.; SCM Marketing, Ltd.; and GRS, Inc.) have agreed to pay cash totaling $157,851.59, and they and other Group C Defendants (Hooters of America, Inc.; SCM Marketing, Ltd.; GRS, Inc.; Stockcar Souvenir Showcase; and Circle Track Promotions) have agreed to issue coupons (the "Group C Coupons") in the total amount of $246,901.05. Each Group C Coupon entitles the bearer to a discount of $2.00 off the price of goods sold by the issuer, and two coupons may be aggregated toward the purchase of goods priced at $8.00 or more. The Group D Defendants (Kudzu, LLC; GEB, Inc.; Little Faster, Inc.; and Sports Design, Inc.) have agreed to pay cash totaling $167,326.00 and have agreed to issue coupons (the "Group D Coupons") with a total value of $120,-300.00. Group D Coupons entitle the bearer to a $2.00 discount off any goods priced at $10.00 or more, and two coupons may be aggregated for purchases of $25.00 or more. The coupons issued pursuant to the settlement are fully transferable and valid through at least an entire racing season. Importantly, the Defendants' settlement obligations are not discharged until 93.7% of the coupons are redeemed. Mere issuance of the coupons will not satisfy the settlement agreements.

On June 7, 2000, this Court issued an order that Summary Notice of Proposed Settlements of Class Action ("Summary Notice") be published in a manner calculated to reach the Settlement Class. The Summary Notice contained information relating to the claims asserted in the action, the terms of the proposed settlements, the application for attorneys' fees and expenses, the dismissal and release of claims that the settlements contemplate, and the settlement class members' rights to opt out of or object to the settlements or the application for attorney's fees and expenses.

Notice to the settlement class was difficult because members of the class are not readily identifiable. The vast majority of the purchases made by the class members were by cash and were not documented by either party to the transactions. Furthermore, many items themselves likely have been lost, consumed or destroyed. In an attempt to provide the most comprehensive notice to class members, Plaintiffs utilized Kinsella Communications. Using data available from MediaMark Research Inc., Kinsella designed a profile of class-member demographics and media consumption habits so that dissemination of the Summary Notice would target the largest number of class members. Publication notice took the form of advertising in national auto racing and NASCAR publications, local newspapers, and earned or free media. Electronic notice was given through paid advertising on selected Internet sites, a home page set up on the Internet, and a public service announcement posted on Usenet Newsgroups. Because class members cannot be identified personally, notice by publication is constitutionally sufficient. *Eisen v. Carlisle*, 417 U.S. 156, 166–67, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *In re Domestic Air Transp. Antitrust Litig.*, 141 F.R.D. 534, 550–551 (N.D.Ga.1992). This is especially true where, as here, Plaintiffs' counsel published the Summary Notice in newspapers in the areas where racetracks are located, in stockcar racing magazines, and also on the Internet for an extended period.

As of August 18, 2000, the Plaintiffs' reported that the settlement website had received 48,088 "hits", and 13,043 claim forms had been downloaded. The claims administrator has mailed 505 hard copies

of the notice and received 247 claim forms. The deadline for receiving forms is November 30, 2000. Only two objections, since withdrawn, and one request for exclusion were timely received.

## II. STANDARD OF REVIEW

 Federal Rule of Civil Procedure 23(e) requires judicial approval of the settlement of class actions, but provides no standard for the district judge to apply in considering a proposed settlement. It is, however, well-established that a settlement should be approved if it is fair, adequate, reasonable and free of fraud or collusion. *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir.1984). In its evaluation of the proposed settlement, the court should be mindful of the judicial policy favoring settlement and cognizant that "compromise is the essence of settlement." *Bennett*, 737 F.2d at 986. Settlements conserve judicial resources by avoiding the expense of a complicated and protracted litigation process and are highly favored by the law. *Miller v. Republic Nat. Life Ins. Co.*, 559 F.2d 426, 428 (5th Cir.1977).[2]

 Although judicial discretion to approve a settlement is broad, the Court should not conduct a trial on the merits. *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 315 (N.D.Ga.1993). The court is entitled to rely on the judgment of the parties in approving the proposal and should be "hesitant to substitute its own judgment for that of counsel." *Id.* at 313 (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir.1977)). The court's authority likewise does not extend to modification of the settlement; the court may only approve or disapprove a proposed settlement. *Id.* at 313. Overall, the court must be satisfied that the settlement was not a product of collusion but reached pursuant to arms length negotiations between the parties after significant discovery. *Id.* at 313.

## III. DISCUSSION

 In analyzing whether the proposed settlements protect the interests of the absent class members, the Court must consider: (1) the likelihood of success at trial; (2) the range of possible recoveries; (3) the point on or below the range of possible recoveries at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and degree of opposition to the settlement; and (6) the stage of the proceedings at which the settlement was achieved. *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir.1984). The Court concludes that the present settlements satisfy the *Bennett* factors and should be approved.

## A. THE LIKELIHOOD OF SUCCESS AT TRIAL

Plaintiffs' likelihood of success at trial depends heavily on whether the class would be certified if the settlements were not approved. This requires at least brief discussion of the interplay between Rule 23 and the Eleventh Circuit's antitrust jurisprudence. Plaintiffs could probably show without great difficulty that the class satisfies the numerosity, commonality, typicality and adequacy of representation requirements of Rule 23(a). The difficulty comes with respect to the predominance requirement of Rule 23(b)(3). The Plaintiffs, as a matter of substantive law, must establish antitrust impact. Plaintiffs may establish antitrust impact by showing that the Defendants' activities had the effect of stabilizing prices above competitive levels. Regarding proof of antitrust impact, the Eleventh Circuit requires the Plaintiffs to demonstrate that they would prove "impact as to each member of the plaintiffs' class without having to resort to lengthy individualized examinations." *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 328 (5th

**2.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

Cir.1978). This is a difficult requirement because impact is a question unique to each particular individual and must be proven with a fair degree of certainty. *In re Polypropylene Carpet Antitrust Litigation,* 178 F.R.D. 603, 617 (N.D.Ga.1997).

As noted earlier, proof that class members suffered an injury as a result of Defendants' conduct cannot easily be proven. Because most class members purchased their souvenirs and other merchandise at races using cash and may no longer possess the items themselves, many class members likely do not recall precisely what items they bought, how much each item cost, and from which vendors the purchases were made. Additionally, the Defendants' product lines have changed during the class period, and many vendors have ceased selling at the tracks, have changed their line of business, have acquired competitors or have been acquired, or otherwise have changed the fundamental nature of their operations. These facts suggest that proof of antitrust impact would require lengthy individualized examinations. Defendants mounted a vigorous challenge to Plaintiffs' statistical model for proving damages. Plaintiffs' response to the Defendants' statute of limitations defense also raised serious predominance questions. For these reasons, there is a serious question as to whether Plaintiffs could obtain class certification status if they had not entered into the settlements. Without class certification Plaintiffs' case would fail as it would be unlikely that class members would proceed on an individual basis due to the modest damage claim of each class member.

Assuming that a plaintiff class could be certified notwithstanding these difficulties, the trial process is always fraught with uncertainty. The fact that this is a complex, antitrust suit only adds to the uncertain outcome of the case should it proceed to the trial stage. Additionally, any victory that the Plaintiffs may obtain at trial could be tied up in the appellate process for years, effectively delaying or even eliminating any possible recovery. The settlements are a positive alternative to the prospect of receiving no recovery, and are in the best interest of the settlement class. The complexities of this case, together with the unpredictability of a lengthy trial and appellate process weigh heavily in favor of approving the settlements.

## B. THE RANGE OF POSSIBLE RECOVERIES

In assessing the settlements, the Court must look to the range of possible damages that Plaintiffs could recover at trial and then combine this assessment with the likelihood of Plaintiffs' success at trial to determine whether the settlements fall within the range of recoveries that is fair. *Domestic Air Transp.,* 148 F.R.D. at 319. The settlements before the Court yield a total value of $11.4 million in benefits: $5.6 million in cash and $5.7 million in coupons. Because the Plaintiffs face a real risk of no recovery without the settlements, the proposal provides an immediate and substantial benefit to class members. Although about half of the settlements proceeds are in the form of coupons, the coupon portion of the settlements nonetheless provide significant value to class members. In addition, had the parties not reached the settlements, tremendous resources of the parties and the Court would have been expended in an attempt to obtain a judgment that quite possibly would not provide any greater relief for the class. Thus, the Court finds that when the settlements are weighed against the risks and costs of continued litigation, the settlements are well within the range of possible recoveries and should be approved.

## C. THE POINT ON OR BELOW THE RANGE OF POSSIBLE RECOVERY AT WHICH A SETTLEMENT IS FAIR, ADEQUATE, AND REASONABLE

The first step the Court must take in evaluating whether a cash and coupon set-

tlement falls within the "range of reasonableness" is to examine the total value of the settlement to the class. *Id.* at 320. If this amount is reasonable in light of the costs and risks hindering a Plaintiff's recovery, then it is likely fair, adequate and reasonable. The Court is mindful that class action settlements involving coupons have been criticized and disproved. *See In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation,* 55 F.3d 768, 807 (3rd Cir.1995) (holding that the District Court abused its discretion in concluding that the coupon settlement providing class members with $1,000 coupons toward the purchase of a new truck was fair, adequate, and reasonable), *Buchet v. ITT Consumer Fin. Corp.,* 845 F.Supp. 684, 692 (D.Minn.1994) (holding that the coupons offered to class members toward the purchase of new or refinanced loans were too speculative in value and settlement disapproved). Coupon settlements have been criticized because their actual economic value is speculative, and in some cases appear to benefit defendants and the plaintiffs' attorneys more than they provide value to the class members. *See General Motors,* 55 F.3d at 808 (stating that the coupon settlement may be "little more than a sales promotion for GM"). Due to the transaction costs involved with the use of coupons, their actual value is an amount usually lower than face value. Even when coupons have many attractive features which lead to high redemption rates, courts usually will not attribute a value to the coupon equivalent to its face. *Domestic Air Transp.,* 148 F.R.D. at 322. Nevertheless, this does not necessarily mean that the court should disapprove a coupon settlement. "That the proposed settlement amounts to a fraction of potential recovery does not render the proposed settlement inadequate and unfair." *Id.* at 325. The court in *Domestic Air Transp.* approved a coupon settlement amounting to $408 million in discount travel certificates. The court concluded that, after adjusting for transaction costs, the value of the settlement ranged from $254 to $356 million, and that this amount was fair, adequate and reasonable to the class. *Id.* at 323.

Features of coupon settlements, like those in *Domestic Air* and the present settlements, that increase the total value of the settlement will improve the likelihood of a court's approval. Such features include the transferability of the coupons, likelihood of actual redemption, few or no limitations placed on redemption, and the usefulness of the settlement coupons as compared to other promotional coupons. *Id.* at 321. The Court finds that there are aspects of the present coupon settlements that enhance the value of the total settlement, and weigh in favor of approval of the settlements.

To assist in evaluating more precisely the value of the coupon program contained in the settlements, the Plaintiffs utilized the services of Dr. Ravi Dhar, a Professor at the Yale School of Management. His report has been filed with the Court. Dr. Dhar concludes that the coupon settlements here are quite beneficial to the class members and differ from those coupon settlements which have been criticized. First, the fact that the coupons in the present settlements are fully transferable to others increases their value in relation to other coupon settlements. In *General Motors,* the Third Circuit disapproved a coupon settlement that would have provided class members with a $1,000 coupon towards the purchase of a new truck, but which contained significant limitations to the coupons' transferability. Unlimited transfers could be made but only to a person in the class member's immediate family who resided with the class member. Any transfer to an immediate family member who did not reside with the class member could be made only if designated within 60 days from the mailing of notices by GM. Otherwise, the class member could transfer the coupon only with title to the truck when purchased by a third party, or request a nontransferable $500.00 certificate be issued to *any* third party in the

place of a $1,000 coupon to the class member. Unlike the coupons in *General Motors,* the coupons in the present settlements are freely transferable to any third party without a reduction in the face value of the coupon. This is one reason why the present coupon program warrants approval despite general criticism of coupon settlements.

Second, Dr. Dhar states that the present coupon settlements have several features which elevate the likelihood of redemption, concomitantly increasing the value of the coupons to class members. Those Defendants participating in the coupon program have agreed to continue issuing coupons until the face value of each of the settlements is reached in redemptions. Thus, in general, Defendants' obligation pursuant to the settlements will not diminish solely because a coupon has been issued. Only if several years elapse and the redeemed value has not reached the limit of the Defendants' obligations may Defendants discharge their liability at that time by making donations to charitable organizations. They are, therefore, not completely freed from liability by lapse of time.

In *Buchet,* the fact that the defendants refused to guarantee a minimum cash contribution contributed to the disapproval of the coupon settlement. The settlement in *Buchet* was strictly in the form of coupons and provided no provision that to the extent coupons for new or refinanced loans were not redeemed, a contribution to charitable organizations would be made. *Buchet,* 845 F.Supp. at 696. The parties in the present settlement have remedied the problems identified by the *Buchet* court. Half of the total settlements will be in actual cash payments. As noted above, to the extent that obligations of the coupon portion of the settlement are not satisfied by actual redemptions, the Defendants must satisfy their financial obligation by making a *cash* contribution to charity. The value of the coupon program is enhanced by these features and is another factor weighing in favor of approval.

Third, the length of time during which the coupons may be redeemed also increases the redemption rate. Theoretically, the longer the time available for redemption, the higher the redemption rates. In practice, the acceptable time is dictated by the product category. It may be reasonable for frequently purchased items to have a shorter acceptable redemption time than those high-ticket items, such as refrigerators or automobiles, that are bought infrequently. Because these settlements involve coupons for small, fungible items purchased at sporting events, Dr. Dhar opines that one year is a clearly acceptable redemption period. The Court agrees. Class members who wish to redeem the coupons will have no trouble doing so within the redemption period as members will not have to expend or borrow large amounts of money to purchase the underlying items.

Fourth, the face value of the coupon is another factor relevant to the likelihood of redemption and in this case supports approval of the proposed Settlements. As a matter of illustration, Dr. Dhar states that a $1.00 coupon is more likely to be redeemed for a box of cereal than is a $1.00 coupon for a personal computer, even though the absolute savings are equal. The coupons offered in the present Settlements have significant face value (25% off for Group A Coupons; $15.00 off for Group B Coupons; $2.00 off for Group C Coupons and Group D Coupons). Because of the features discussed above, their face value is close to if not equal to their real value. Although it is true some coupon settlements with a large face value have not been approved, those cases typically have involved high-priced, infrequently purchased items. *See, e.g., General Motors,* 55 F.3d at 807 (3rd Cir.1995) (holding $1,000 coupon toward the purchase of a new truck was not reasonable when the vast majority of recipients could not afford such a purchase within the 15 month redemption period). The Third Circuit in *General Motors* characterized

the coupon settlement in that case as little more than a sales promotion for GM, because class members might feel obligated to purchase an expensive automobile just to redeem the coupon. The court also questioned whether the coupon would be virtually worthless to many class members because they could not afford to purchase a brand new automobile during the redemption period. *General Motors*, 55 F.3d at 808. Conversely, as stated above, class members here will be buying relatively inexpensive merchandise which can be redeemed easily within the redemption period without members incurring any substantial financial liability.

Finally, aggregation of coupons or merchandise is another value enhancing feature of the present program. Five coupons may be aggregated in the Group A settlement. In the Group B settlement, several items may be combined to reach the $15.00 discount amount. Pursuant to the Group C settlement, two coupons may be aggregated for the purchase of $8.00 or more, while two coupons may be combined for a purchase price of $25.00 or more according to the Group D settlement. The significant aggregation opportunities is another factor contributing to the increased value of the total settlement. Aggregation prevents class members from having to make numerous purchases, thus providing greater financial benefit to the Defendants. Instead, aggregation allows class members to purchase fewer of Defendants' products and at less overall cost to the class members.

Compensation in the form of coupons has been approved by other courts where, as here, the class is not readily identifiable. *See, e.g., Domestic Air Transp.*, 148 F.R.D. at 305 (approving settlement of $50 million in cash combined with discount travel certificates with a face value of $408 million); States of *New York v. Nintendo of America*, 775 F.Supp. 676, 682 (S.D.N.Y. 1991) (distribution of $5 coupons approved as settlement of nationwide antitrust class action); *In re Cuisinart Food Processor*

*Antitrust Litig.*, 1983 WL 153, at *8 (D.Conn. Oct. 24, 1983) (approving settlement that provided for coupon discounts off Cuisinart products); *Ohio Public Interest Campaign v. Fisher Foods, Inc.*, 546 F.Supp. 1, 5 (N.D.Ohio 1982) (approving settlement of class action where relief consisted of $20 million in $1.00 coupons). In all these cases, the coupon settlements contained similar features that the courts found provided real value to the settlement class. Like aspects of the present case, such features included few, if any, limitations on transferability, acceptable redemption periods, and high face value applied to relatively inexpensive, frequently purchased items. When these factors are present in a coupon settlement, courts find that the value conferred on the settlement class warrants approval. Likewise, this Court concludes the present settlements should be approved. It is the Court's belief that the coupon program, combined with the cash settlement and taking into account the risks and expenses of proceeding to trial with the possibility of no recovery, is well within the range of a fair, adequate and reasonable recovery. The Court notes that it authorized an award of attorneys' fees based upon a percentage of the cash recovery only. Thus, the class members will receive the full value of the coupon portion of the settlements without any offset for attorneys' fees and expenses.

## D. THE COMPLEXITY, EXPENSE, AND DURATION OF THE LITIGATION

An antitrust class action is arguably the most complex action to prosecute. The legal and factual issues involved are always numerous and uncertain in outcome. A trial would take weeks, if not months to complete, notwithstanding the massive pretrial preparation that would be required of the parties. In fact, both sides have already invested a great deal of time and expense in reaching the point of settlement. This case started in 1997 with several Complaints filed here and in North

Carolina. All cases were transferred to and consolidated in this Court. There has been extensive discovery conducted in the case, resulting in the production of millions of pages of documents. More than 70 depositions have been taken. The issue of class certification itself has resulted in significant expense to both sides, as experts were engaged and depositions taken on this issue. Plaintiffs were not certain to survive the class certification stage. If they did, the possibility of summary judgment motions would add even more time and expense to the litigation. The settlement negotiations were vigorous and protracted. It took approximately 14 months to reach settlement agreements with all Defendants. The tremendous expense incurred to date would only grow were the litigation to proceed. Because of the complex issues presented in this case and its already lengthy duration, the prospect of continued litigation supports the Court's finding that the proposed settlements are in the best interest of the class and should be approved.

### E. SUBSTANCE AND DEGREE OF OPPOSITION TO THE SETTLEMENT

There were no objections filed other than two which were later withdrawn, and no one appeared at the hearing to object to the terms of the proposed settlements. The lack of objection to the settlements suggests that the terms are satisfactory to those affected. The Court, however, may not simply approve the settlements because of the lack of opposition to its terms. *In re Chicken Antitrust Litig.*, 560 F.Supp. 957, 960 (N.D.Ga.1980). "The approval of even an unopposed settlement can be no less critical than a decision on the merits after a full trial, because a settlement may just as easily compromise the rights and expectations of a class member." *Id.* at 959–60. The Court must still consider whether the proposed, unopposed settlements meet the appropriate standard. *Id.* at 960. Because all other factors discussed in great detail above weigh in favor of approval of the settlement, the lack of objections is a further factor weighing in favor of approval of the settlements.

### F. THE STAGE OF PROCEEDINGS AT WHICH THE SETTLEMENT WAS ACHIEVED

The parties have taken expert testimony, reviewed voluminous documents, filed numerous motions, and conducted over 70 depositions. The settlement agreements were entered into when both parties were fully apprized of the facts, risks and obstacles involved with the possibility of continued litigation. As a result, the Court concludes that the parties were well-informed of the strengths and weaknesses of each side's case. This was not a quick settlement, and there is no suggestion of collusion. As noted earlier, at the time settlement was reached, the parties had conducted extensive discovery. The settlement was reached by arms-length negotiations after extensive discovery. *See, Domestic Air Transp.* 148 F.R.D. at 313 (approving settlement providing coupons for air-fares in part because negotiated at arms-length after discovery by both sides). Consideration of this factor also suggests favorable approval of the settlements.

### IV. CONCLUSION

For all of the above reasons, the Court concludes that the settlements arrived at in this case are fair, reasonable, the product of arms-length negotiations, and should be approved.